UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF NEW YORK

DAVID STEVENSON and LESLIE )
STEVENSON, )
 )
    Plaintiffs, )
 )
    v. )          Case No. 1:21-cv-355
 )
NEW YORK STATE DEPARTMENT OF )
CORRECTIONS AND COMMUNITY )
SUPERVISION, THOMAS STICHT, )
CRAIG BALCER, MICHAEL )
HERSPERGER, and CHRISTOPHER )
YEHL, )
 )
    Defendants. )

**ORDER ON MOTIONS TO DISMISS AND ON MOTION TO AMEND COMPLAINT**
**(Docs. 19, 29, 36)**

In their original six-count complaint, New York State Department of Corrections and Community Supervision ("DOCCS") employees Leslie Stevenson and her husband David Stevenson sue their employer and DOCCS Superintendent Thomas Sticht, Captain Craig Balcer, Lieutenant Michael Hersperger, and Deputy Director of Security Christopher Yehl.[1]  Plaintiffs claim that they experienced harassment and retaliation at their workplace—the Wyoming Correctional Facility ("Wyoming")—in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e et seq.; and in violation of 42 U.S.C. §§ 1983 and 1985.  They also bring a defamation claim.  (*See* Doc. 2.)  Plaintiffs seek $16 million in compensatory and punitive damages and injunctive relief reassigning all individual defendants to a different correctional facility.  (*Id.* at 29.)

---

[1] The court refers to the individual plaintiffs by their first names and to the individual defendants by their last names without rank or other honorifics; no disrespect is intended.

Represented by the New York Attorney General's office, DOCCS and three of the individual defendants—Sticht, Balcer, and Yehl—have filed a Partial Motion to Dismiss under Fed. R. Civ. P. 12(b)(1) and 12(b)(6). (Doc. 19.) Represented by private counsel, Hersperger has filed his own motion joining his co-defendants' motion and asserting arguments for dismissal of the claims against him. (Doc. 29.) Plaintiffs oppose both motions (Docs. 32, 33) and Hersperger and the remaining defendants filed replies in August 2021. (Docs. 34, 35).

Plaintiffs filed a motion under Fed. R. Civ. P. 15(a)(2) to amend the complaint on October 20, 2021. (Doc. 36.) Based on the same factual allegations as those asserted in the original complaint, Plaintiffs now seek to bring a total of 12 counts. (*See* Doc. 36-4.)[2] Many of the proposed 12 counts mirror the Title VII, Section 1983, and defamation counts in the original complaint, but with some clarifications. The proposed Amended Complaint would also add three new counts under the New York State Human Rights Law ("NYSHRL"). At a hearing on October 21, 2021 previously scheduled for argument on the pending motions to dismiss, the court set deadlines for the opposition and reply memos in connection with the motion to amend. The parties have filed their memos (Docs. 38, 40, 41, 42) and the court rules on all pending motions here.

## Background

It is unnecessary to recite here all of the allegations in Plaintiffs' 198-paragraph Complaint.[3] Plaintiffs allege that "[i]n or around August or September 2017, Lieutenant Michael Hersperger referred to Leslie Stevenson as a 'hot, sexy, female C.O.' when he answered a phone

---

[2] Since the factual allegations are the same in both pleadings, the court cites to both in the analysis below.

[3] The court refers here to the allegations in the original complaint. They are virtually the same as the factual allegations in the proposed Amended Complaint. (*See* Doc. 36-4.)

call Leslie had placed to her co-worker, C.O. Andrew Lamb." (Doc. 2 ¶ 28.)  Plaintiffs further allege that Leslie complained about that remark and her husband David, a Lieutenant at the same facility, "helped her bring forth her complaints." (*Id.* ¶ 4.)  Plaintiffs allege that "[a]fter that, Leslie and David had targets on their back.  From excessive scrutiny and nitpicking to isolating them from their co-workers, defendants are putting their employees' livelihoods and *lives* at risk by undermining them at every turn." (*Id.*)  More detailed factual allegations are set forth as necessary below.

## Analysis

### I.    Legal Standards

#### A.    Rule 12(b)(6) Standard

The Rule 12(b)(6) standard applies to most of Defendants' requests for dismissal.[4]  On a Rule 12(b)(6) motion, the court's task is "to determine whether, accepting the allegations contained in the complaint as true, and drawing all reasonable inferences in favor of the non-movant, plaintiffs have stated a facially valid claim." *Ocasio v. City of Canandaigua*, 513 F. Supp. 3d 310, 319 (W.D.N.Y. 2021) (cleaned up).  "In order to be found sufficient, a pleading must set forth sufficient facts to suggest that a cause of action is legally plausible." *Id.* (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "Ultimately, where a plaintiff has

---

[4] Although Rule 12(b)(1) arguably applies to Defendants' argument that the court lacks jurisdiction to grant the injunctive relief that Plaintiffs seek, the differences between the Rule 12(b)(1) and Rule 12(b)(6) standards are not material here. *See Hawkins v. GM Components Holdings LLC*, 405 F. Supp. 3d 483, 486 n.1 (W.D.N.Y. 2019) (noting distinction between standards but ruling that court's decision would be the same under both).

not nudged their claim across the line from conceivable to plausible, their complaint must be dismissed." *Id.* (cleaned up).[5]

### B.     Rule 15(a)(2) Standard

The federal rules instruct courts to give leave to amend "freely . . . when justice so requires." Fed. R. Civ. P. 15(a)(2).  Despite this permissive standard, leave to amend may be denied "upon a showing of 'undue delay, bad faith, dilatory motive, [or] futility.'" *Sacerdote v. N.Y. Univ.*, 9 F.4th 95, 115 (2d Cir. 2021) (alteration in original) (quoting *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015)).  "The party opposing a motion for leave to amend bears the burden of establishing that the amendment should be denied." *Gonzalez v. City of Rochester*, No. 16-CV-6652L, 2020 WL 5032026, at *3 (W.D.N.Y. Aug. 26, 2020); *Joinnides v. Floral Park-Bellerose Union Sch. Dist.,* No. CV 12-5682(JS)(AKT), 2015 WL 1476422, at *9 (E.D.N.Y. Mar. 31, 2015) ("The party opposing the motion for leave to amend has the burden of establishing that an amendment would be prejudicial or futile.") (cleaned up).

---

[5] Hersperger devotes a significant portion of his reply memorandum to argue that Plaintiffs misstated the applicable pleading standard in their opposition.  (Doc. 35 at 3–5.)  It is true that Plaintiffs' memorandum in opposition to Hersperger's motion (*see* Doc. 33 at 12) cites pre-*Iqbal* and *Twombly* cases describing the Rule 12(b)(6) standard as prohibiting dismissal unless "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984); *see also SEC v. U.S. Envt'l, Inc.*, 155 F.3d 107, 110 (2d Cir. 1998).  But "[a]fter *Twombly* and *Iqbal*, this 'no set of facts' pleading standard is no longer the law." *Courchevel 1850 LLC v. Stern*, No. 17-CV-1794 (NGG) (JO), 2018 WL 3193210, at *1 n.1 (E.D.N.Y. June 28, 2018); *see also Horsting v. St. John's Riverside Hosp.*, No. 17-CV-3230 (CS), 2018 WL 1918617, at *2 n.2 (S.D.N.Y. Apr. 18, 2018) ("This 'no set of facts' standard was 'retire[d]' by *Twombly* in 2007. . . . Nobody . . . should be citing it any longer." (brackets in original)).  Still, Plaintiffs also repeatedly refer to the plausibility standard (*see* Doc. 33 at 12–16, 19), which is the standard that the court applies here.

1.        **Delay or Prejudice**

Defendants correctly note that Plaintiffs filed their motion to amend five months after the motions to dismiss and on the night before oral argument on those motions.  Defendants argue that leave to amend should be denied on grounds of delay and prejudice.  (*See* Doc. 39 at 16.)[6] They contend that it is Plaintiffs' burden to explain the delay and that Plaintiffs have failed to meet that burden.  Plaintiffs maintain that delay is not a basis for denial of leave to amend without a showing of bad faith or undue prejudice, and that Defendants have not met their burden to show either.  (Doc. 41 at 5–6; Doc. 42 at 6–7.)

Defendants seek to shift the burden to Plaintiffs to explain the delay in this case.  It is true that district courts have discretion to deny leave to amend "where the motion is made after an inordinate delay, no satisfactory explanation is made for the delay, and the amendment would prejudice the defendant."  *MacDraw, Inc. v. CIT Grp. Equip. Fin., Inc.*, 157 F.3d 956, 962 (2d Cir. 1998) (quoting *Cresswell v. Sullivan & Cromwell*, 922 F.2d 60, 72 (2d Cir. 1990)); *see also* 3 *Moore's Federal Practice – Civil* § 15.15[2] (3d ed. 2021) ("If the delay is particularly egregious, some decisions shift the burden to the moving party to show that its delay was due to oversight, inadvertence, or excusable neglect . . . .").  But the delay in this case does not qualify as "inordinate" or "particularly egregious."  *Cf. MacDraw*, 157 F.3d at 962 (five-year delay). And even in cases of unexplained delay, the nonmoving party still has some burden to show prejudice.  *See Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993) (quoting *Evans v. Syracuse City Sch. Dist.*, 704 F.2d 44, 47 (2d Cir. 1983)) ("[T]he longer the period of an

_____

[6] Hersperger has adopted the other defendants' arguments in opposition to the proposed amendment.  (Doc. 40 at 4.)

unexplained delay, the less will be required of the nonmoving party in terms of a showing of prejudice."). The court therefore focuses on that issue.

The Second Circuit has advised that courts evaluating "prejudice" should consider "whether the assertion of the new claim would: (i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction." *Block*, 988 F.2d at 350. Defendants do not raise any argument under the third factor. Instead, they maintain that "[a]t a minimum, the filing of an amended complaint has required further briefing and delay." (Doc. 39 at 17.)

That is insufficient to satisfy Defendants' burden in opposing amendment. The proposed amendment does require some additional time and expense to analyze. But this case is still in its early stages and Defendants themselves recognize that the NYSHRL claims are "largely duplicative" of the Title VII claims. (*Id.*) Indeed, claims brought under Title VII and NYSHRL follow identical analytical frameworks, so Defendants would not be prejudiced by significant additional briefing. *See Spiegel v. Schulmann*, 604 F.3d 72, 80 (2d Cir. 2010) ("[A] plaintiff's discrimination claims under . . . NYSHRL . . . are subject to the burden-shifting analysis applied to discrimination claims under Title VII."). Several of the other proposed amendments simplify the analysis by clarifying which plaintiff(s) are suing which defendant(s). Allowing the proposed amendments would not require Defendants to expend significant additional resources or significantly delay the resolution of the dispute.

Defendants also rely on *Frenkel v. N.Y.C. Off-Track Betting Corp.*, 611 F. Supp. 2d 391 (S.D.N.Y. 2009), *opinion adopted*, 701 F. Supp. 2d 544 (S.D.N.Y. 2010). The court in that case remarked that leave to amend may be denied "when the movant knew or should have known of

the facts upon which the amendment is based when the original pleading was filed, particularly

when the movant offers no excuse for the delay." *Id.* at 394 (quoting *Berman v. Parco*,

986 F. Supp. 195, 217 (S.D.N.Y. 1997)). But *Frenkel* does not stand for the proposition that

failure to amend a pleading based on previously known facts "is itself dispositive for denying the

motion." *Phoenix Light SF Ltd. v. HSBC Bank USA, Nat'l Ass'n*, No. 14-CV-10101 (LGS) (SN),

2021 WL 568080, at \*2 (S.D.N.Y. Feb. 16, 2021). Since discovery has not yet begun in this

case, the prejudice to Defendants is minimal and allowing amendment is consistent with

resolving the dispute on the merits. *See id.* ("[T]he relevant question to determine undue delay

under Rule 15(a)(2) is not how much time has elapsed since the complaint was filed, but how

much remains before the Court evaluates its merits.").

### 2.    Futility

"Futility is a determination, as a matter of law, that proposed amendments would fail to

cure prior deficiencies or to state a claim under Rule 12(b)(6) of the Federal Rules of Civil

Procedure." *In re Tribune Co. Fraudulent Conveyance Litig.*, 10 F.4th 147, 175 (2d Cir. 2021)

(quoting *Empire Merchs., LLC v. Reliable Churchill LLLP*, 902 F.3d 132, 139 (2d Cir. 2018)).

The court applies the "futility" analysis in the course of evaluating the claims below.

## II.    Title VII Claims

Counts 1–3 of both the original and proposed Amended Complaint are Title VII claims.

The original complaint does not explicitly specify which of the defendants are being sued under

Counts 1–3. That prompted arguments from individual defendants Sticht, Balcer, Yehl, and

Hersperger that Title VII claims cannot be brought against individuals in their personal

capacities. (*See* Doc. 19-1 at 6; Doc. 29-1 at 7.) That is indeed the law. *See Hilton v. Bedford

Paving, LLC*, 769 F. Supp. 2d 92, 99 (W.D.N.Y. 2010) (citing *Ziegler v. Adams*, 316 F. App'x

7

52, 52–53 (2d Cir. 2009) (summary order)) ("[I]t is well-settled law in this Circuit that individuals cannot be sued under Title VII."); *see also Naumovski v. Norris*, 934 F.3d 200, 212 (2d Cir. 2019) (Title VII claims may be brought only against the employing entity).

But in their opposition to the Rule 12 motions, Plaintiffs have clarified that they do not allege that any of the individual defendants are liable under Title VII.  (Doc. 32 at 8; Doc. 33 at 7.)  And the proposed Amended Complaint unambiguously states that Counts 1–3 are brought against DOCCS only.  The court concludes that amendment should be granted in this respect and that the individual defendants' motions to dismiss Counts 1–3 are moot.  Counts 1–3 remain in the case as against DOCCS.

## III.    Section 1983 Claims

Although Title VII is the exclusive remedy for *federal* employment discrimination, that is not so for state and municipal employment discrimination.  *Annis v. Cnty. of Westchester, N.Y.*, 36 F.3d 251, 255 n.4 (2d Cir. 1994).  The court accordingly proceeds to evaluate the plausibility of Plaintiffs' § 1983 claims.

Whereas the original complaint contains only one count under § 1983 (Doc. 2 ¶¶ 172–183), the proposed Amended Complaint breaks the § 1983 claims into four separate counts: (1) discrimination by Hersperger against Leslie (proposed Count 4); (2) sexual harassment by Hersperger against Leslie (proposed Count 5); (3) retaliation by Hersperger, Balcer, Sticht, and Yehl against Leslie (proposed Count 6); and (4) retaliation by Hersperger and Balcer against David (proposed Count 7).  (*See* Doc. 36-5 ¶¶ 192–233.)  This clarifies that Plaintiffs do not seek to charge DOCCS under § 1983 and moots DOCCS's argument for dismissal of those claims against it.  The court considers below the plausibility of the § 1983 claims against the individual defendants.

First, the court pauses to review some relevant general principles. "A plaintiff who claims sex discrimination in public employment in violation of the Fourteenth Amendment may bring suit pursuant to § 1983." *Naumovski*, 934 F.3d at 212. "Such § 1983 discrimination claims parallel Title VII discrimination claims in many respects." *Id.*

> [A]s with Title VII claims, a plaintiff may allege both traditional "disparate treatment" claims and "hostile work environment" claims. The basic elements of such claims, whether pursued under Title VII or § 1983, are similar: (1) a plaintiff claiming disparate treatment under either statute must plausibly allege that she suffered an "adverse employment action" taken "because of" her sex, and (2) a plaintiff claiming a hostile environment must plausibly allege offensive conduct based on sex that was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."

*Id.* (footnoted citations omitted). In addition, "retaliation is a form of discrimination," and a state employee may bring a retaliation claim under § 1983. *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 82 (2d Cir. 2015).

For a § 1983 discrimination claim to survive a motion to dismiss, a plaintiff must "plausibly allege a claim under the same standards applicable to a Title VII claim—and that the adverse action was taken by someone acting 'under color of state law.'" *Vega*, 801 F.3d at 88.[7] "Claims brought pursuant to Title VII are analyzed under the framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973)." *Bockus v. Maple Pro, Inc.*, 850 F. App'x 48, 50 (2d Cir. 2021) (summary order). Namely:

> "[A]bsent direct evidence of discrimination, what must be plausibly supported by facts alleged in the complaint is that the plaintiff [1] is a member of a protected class, [2] was qualified, [3] suffered an adverse employment action, and [4] has at least minimal support for the proposition that the employer was motivated by discriminatory *intent*."

---

[7] The Second Circuit in *Naumovski* observed that § 1983 and Title VII discrimination claims are not exactly the same in all respects. *See Naumovski*, 934 F.3d at 212–13. The differences are not at issue here.

*Id.* (numbered brackets in original) (emphasis added) (quoting *Littlejohn v. City of N.Y.*, 795 F.3d 297, 311 (2d Cir. 2015)); *see also Naumovski*, 934 F.3d at 216 n.50 ("[T]o establish an Equal Protection violation, a plaintiff 'must prove that she suffered *purposeful or intentional* discrimination on the basis of gender.'" (emphasis added) (quoting *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 118 (2d Cir. 2004))).

All of the § 1983 counts incorporate Plaintiffs' allegations of discrimination (Count 1) and retaliation (Counts 2–3).  (*See* Doc. 2 ¶ 172 (original complaint); Doc. 36-5 ¶¶ 192, 200, 208, 220 (proposed Amended Complaint).)  The court considers Defendants' arguments against each of those types of claims in turn.

    A.    **Against Sticht, Balcer, and Yehl**

    1.    **Hostile Environment**

Defendants Sticht, Balcer, and Yehl seek dismissal of the § 1983 hostile environment claim against them on the grounds that Plaintiffs have failed to plead the requisite discriminatory "intent" element.  (Doc. 19-1 at 8.)  They maintain that Plaintiffs have not alleged that any of them "intentionally subjected Leslie to harassment based on sex, instead claiming these individuals failed to stop and/or resolve certain harassment perpetrated by another DOCCS employee to the Plaintiffs' satisfaction."  (*Id.*)  In their reply memorandum, Defendants Sticht, Balcer, and Yehl assert that the § 1983 claim against them can only be an equal protection *retaliation* claim.  (Doc. 34 at 4.)

As this court has observed, an "alleged retaliatory hostile work environment does not create two separate claims."  *Dapson v. City of Rochester, N.Y.*, No. 17-CV-6704 CJS, 2019 WL 591692, at *12 (W.D.N.Y. Feb. 12, 2019).  Rather, a "retaliatory hostile environment, if established, is an element of a *retaliation* claim. . . . namely, that the plaintiff suffered an adverse

employment action." *Id.* (emphasis added).  As against defendants Sticht, Balcer, and Yehl, Plaintiffs' § 1983 hostile-environment claim is an aspect of a retaliation claim.  The proposed Amended Complaint appears to recognize this, and limits all of the § 1983 discrimination claims (other than retaliation) as claims against Hersperger alone.  Accepting the proposed Amended Complaint in that respect, the court concludes that Defendants Sticht, Balcer, and Yehl's request for dismissal of the § 1983 hostile environment claim against them is moot; Plaintiffs are not making that claim except insofar as it is an element of a retaliation claim.

### 2.     Retaliation

"As in discrimination claims, the elements of a retaliation claim based on an equal protection violation under § 1983 mirror those under Title VII." *Vega* 801 F.3d at 91.  "[F]or a retaliation claim under § 1983 to survive a . . . motion to dismiss, the plaintiff must plausibly allege that: (1) defendants acted under color of state law, (2) defendants took adverse employment action against him, (3) because he complained of or otherwise opposed discrimination." *Id.*

Defendants Sticht, Balcer, and Yehl assert that the Complaint lacks any plausible allegations that they took "adverse employment action" against Plaintiffs.  (Doc. 34 at 5.)[8]  They assert that "adverse employment action" means an action that "could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Vega*, 801 F.3d at 90 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)).  A discrete act that has such an effect is indeed the conventional definition of "adverse employment action." *See, e.g.,*

---

[8] This argument appears for the first time in Sticht, Balcer, and Yehl's reply brief.  But the attack on the § 1983 retaliation claim goes hand-in-hand with the fact that the claim is premised on a retaliatory hostile environment.  The court concludes that it is appropriate to consider this issue here.

*Duplan v. City of N.Y.*, 888 F.3d 612, 626–27 (2d Cir. 2018) (quoting *Patane v. Clark*, 508 F.3d 106, 116 (2d Cir. 2007)) (recognizing that "significantly diminished material responsibilities" can constitute adverse employment action).

But alleging a retaliatory hostile environment is an *alternative* way to establish that element of a retaliation claim. *See Shultz v. Congregation Shearith Israel of City of N.Y.*, 867 F.3d 298, 309 (2d Cir. 2017) (quoting *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010)) ("In the context of retaliation, 'adverse employment action' is broader than it is in the context of discrimination."); *Tromblee v. New York*, No. 1:19-CV-0638 (LEK/CFH), 2021 WL 981847, at *10 (N.D.N.Y. Mar. 16, 2021) (citing *Dapson*, 2019 WL 591692, at *12) ("[A] retaliatory hostile work environment constitutes an adverse action, for purposes of a retaliation claim. Alternatively, and more conventionally, Plaintiff can establish a retaliation claim based on a discrete act by her employer that could well dissuade a reasonable worker from making or supporting a charge of discrimination." (internal citations and quotations omitted)).[9]  Here, Plaintiffs have alleged multiple acts by Sticht, Balcer, and Yehl that, when considered together, plausibly indicate a retaliatory hostile environment that constitutes "adverse employment action."  (*See* Doc. 32 at 17–18 (highlighting allegations in the Complaint against Sticht, Balcer, and Yehl).)

---

[9] The panel in *Cody v. County of Nassau*, 345 F. App'x 717, 719 (2d Cir. 2009) (summary order), concluded that engaging in conduct that sought to create a hostile working environment was not "adverse employment action" for purposes of a retaliation claim.  But it does not appear that the district court in *Cody* actually found a "hostile work environment"— only that the defendants "sought to create" such an environment.  *Cody v. Cnty. of Nassau*, 577 F. Supp. 2d 623, 646 (E.D.N.Y. 2008).  In any case, the summary order in *Cody* is non-precedential.  *Force v. Facebook, Inc.*, 934 F.3d 53, 66 n.21 (2d Cir. 2019).  The court accordingly adheres to its ruling in *Dapson* that a retaliatory hostile environment can constitute adverse employment action for purposes of a retaliation claim.  *Dapson*, 2019 WL 591692, at *12.

Defendants do not argue otherwise except in one respect.  In opposition to Plaintiffs'

motion to amend, Defendants focus on proposed Count 7, arguing that David Stevenson has not

plausibly alleged an equal protection retaliation claim against Balcer.  (Doc. 39 at 7.)  Balcer

correctly observes that "actionable retaliation includes only *materially* adverse actions, as

'normally petty slights, minor annoyances, and simple lack of good manners' would not have the

deterrent effect that Title VII's anti-retaliation provision seeks to prevent." *James v.*

*Countrywide Fin. Corp.*, 849 F. Supp. 2d 296, 312 (E.D.N.Y. 2012) (quoting *White*, 548 U.S.

at 68); *see also Shultz*, 867 F.3d at 309 (same).  Referring to the proposed Amended Complaint

(*see* Doc. 36-5 ¶ 228), Balcer asserts that David's allegations against him fit into three

categories:

> (1) Balcer falsely accused David of minor disciplinary infractions and held David
> accountable to higher standards than his peers; (2) Balcer "prevented" David from
> obtaining overtime hours; and (3) Balcer conducted formal counseling in public to
> humiliate David in front of his peers and belittled David in front of his subordinates.

(Doc. 39 at 8.)  And Balcer maintains that the factual allegations concerning his alleged conduct

towards David do not rise to the level of "materially" adverse actions.  (*Id.*)

In reply, David relies in part on the fact that—as noted above—"adverse employment

action" in the context of retaliation is broader than it is in the context of discrimination.  (Doc. 42

at 12.)  That is true, but even that broader definition does not encompass "trivial harms."

*See Shultz*, 867 F.3d at 309 (quoting *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d

556, 568 (2d Cir. 2011)) ("Title VII does not protect an employee from 'all retaliation,' but only

'retaliation that produces an injury or harm.'").  Thus in *Shultz* allegations of a "campaign" of

retaliation for a threat of legal action did not meet the standard for a materially adverse action

because the allegations against the defendants consisted only of negative comments on a phone

call, encouraging employees not to speak with the plaintiff after her last day of work, claiming

that the plaintiff was an employee after her termination in an effort to discredit her, and distributing a negative statement about her after the lawsuit was commenced. *Id.*

For the reasons discussed below, the court nevertheless concludes that the allegations regarding Balcer's conduct indicate more than a collection of a few petty slights, and instead plausibly allege a retaliatory hostile work environment, which "constitutes an adverse action, for purposes of a retaliation claim." *Tromblee*, 2021 WL 981847, at *10. The court applies an objective standard in this analysis, views the alleged acts of retaliation separately and in the aggregate, and is mindful that "some actions may take on more or less significance depending on the context." *Tepperwien*, 663 F.3d at 568.

First, the court considers the allegations regarding Balcer's accusations of disciplinary infractions. David alleges that:

- On May 1, 2019, Balcer "falsely accused David of leaving State grounds with a State vehicle on April 13, 2019 and failing to sign logbooks." (Doc. 36-5 ¶ 77.)

- In February 2020, Balcer told David to re-write a memorandum about an issue that David believed had already been resolved involving leaving early on a scheduled "turn around" assignment. (*Id.* ¶ 95.) On March 16, 2020, Balcer placed a formal memorandum in David's personnel file regarding the issue. (*Id.* ¶¶ 105–106.) Although the practice at issue was "common," Balcer did not discipline any other individual who engaged in it and initiated disciplinary action against David only after Leslie filed a complaint with the Office of Diversity Management. (*Id.* ¶¶ 96–97.)

- On September 29, 2020, Balcer or Hersperger lodged an allegation with the Office of Special Investigations falsely accusing David of acting in contradiction of COVID-19 protocols. (*Id.* ¶¶ 120–121.)

- In December 2020, Balcer or Hersperger falsely told two of David's coworkers that "David was in the parking lot with a camera trying to catch sergeants leaving early for the purpose of having them written up." (*Id.* ¶¶ 133–135.)

Balcer correctly observes that the alleged false accusations would not qualify as the kind of discrete act that constitutes an "adverse employment action." *See Stallworth v. New York*, No. 16-CV-03059 (PAE) (BCM), 2017 WL 4355897, at *19 (S.D.N.Y. July 27, 2017), *report and recommendation adopted*, 2017 WL 4342148 (S.D.N.Y. Sept. 28, 2017) (false accusations and threats to take disciplinary action are not "adverse employment actions"; citing cases). But that is not dispositive because the court is considering Balcer's conduct as a whole to evaluate whether it plausibly amounts to a retaliatory hostile environment.

"Context matters" in this analysis. *Tepperwien*, 663 F.3d at 568 (quoting *White*, 548 U.S. at 69). The court recognizes that a correctional facility like Wyoming is a secure environment with some parallels to the environment at the nuclear power plant in *Tepperwien*. In such facilities one could reasonably expect "little tolerance for mistakes and rule violations, or even perceived mistakes." *Id.* at 572. But this case is in a different posture than *Tepperwien* was when the Second Circuit evaluated that case on appeal. The jury in *Tepperwien* found for the defendant on the hostile environment claim. *Id.* at 560. Here, in contrast, there has been no such jury verdict and it remains to analyze the alleged hostile environment as an element of the alleged retaliation. Moreover, separate elements of the context in the allegations in this case are also relevant.

The conduct related to the "turn around" assignment—especially the letter to David's file—did place David in an "active disciplinary process." *See Lewis v. Erie Cnty. Med. Ctr. Corp.*, 907 F. Supp. 2d 336, 350 (W.D.N.Y. 2012) (formal reprimand added to personnel file can

15

jeopardize future bonuses, raises, and promotions, and could reasonably deter employee from

complaining about discrimination); *cf. Tepperwien*, 663 F.3d at 570 (counseling did not place the

plaintiff in an "active disciplinary process").  Balcer suggests that the discipline was warranted

because David did in fact commit the infraction.  (Doc. 39 at 9.)  But the court must accept as

true the allegations that the infraction was a "common practice"; that Balcer did not discipline

any other individual who engaged in that practice; and that Balcer initiated discipline against

David on this basis only after Leslie filed a complaint.  (Doc. 36-5 ¶¶ 96–97.)

      In addition, according to the proposed Amended Complaint, the December 2020 incident

was not an ordinary false accusation.  According to David, the accusation characterized him "as

a rat and untrustworthy—which is extremely dangerous in a correctional facility."  (Doc. 36-5

¶ 135.)  That context weighs in favor of finding the false accusation to contribute to a hostile

work environment.  The court also considers, below, the other categories of alleged conduct

specified in the proposed Amended Complaint.

      The second category of conduct is an incident on October 14, 2020 when Balcer "tried to

remove David from an overtime job and replace him with Lt. William Gregoire in violation of

the collective bargaining agreement's overtime provisions."  (Doc. 36-5 ¶ 122.)  Balcer points out

the allegation is only that he "tried" to remove David from an overtime job and that there are no

allegations that David actually lost any wages or pay.  (Doc. 39 at 10–11.)  Balcer also notes (*id.*

at 10) that missing a single shift of overtime is not sufficiently material to support a retaliation

claim.  *See Barnhart v. Town of Parma*, No. 07-CV-6056T, 2010 WL 3788039, at *2 (W.D.N.Y.

Sept. 22, 2010) ("With respect to plaintiff Eichas' claim that he was denied overtime on one occasion, such a claim does not state a claim for retaliation . . . .").[10]

*Barnhart* is potentially distinguishable because the facts in that case established that the plaintiff "was not entitled to work overtime on the project at issue." *Barnhart*, 2010 WL 3788039, at *2. And the hostile-work-environment analysis is not limited to whether David actually lost wages or pay. The court concludes that this incident should be considered together with the other allegations.

The final category of conduct concerns acts that Balcer allegedly took to publicly humiliate or belittle David in the workplace. David alleges that on March 2, 2020, Balcer "conducted a formal counseling meeting with David in a hallway related to his leaving early" and that, contrary to DOCCS policies and procedures, the counseling "was conducted in front of David's co-workers and subordinates after David had been relieved for the day, causing David significant embarrassment and humiliation." (Doc. 36-5 ¶¶ 102–104.) David further alleges that on March 23, 2020, Balcer "belittled David during a conversation he had with Sergeant Jeffery Walker." (*Id.* ¶ 107.)

Balcer argues (Doc. 39 at 9) that "[c]onduct 'which could be found to be offensive, discourteous, demeaning, and/or belittling' does not constitute an adverse employment action for purposes of a retaliation claim." *Rivers v. N.Y.C. Hous. Auth.*, 176 F. Supp. 3d 229, 252 (E.D.N.Y. 2016) (quoting *Sangan v. Yale Univ.*, No. 3:06-CV-587, 2008 WL 350626 (PCD), at *4 (D. Conn. Feb. 7, 2008)). It is true that, standing alone, such conduct would not likely rise

---

[10] *But see Sealy v. State Univ. of N.Y. at Stony Brook*, No. CV 17-1137 (JFB)(AYS), 2018 WL 3151701, at *11 (E.D.N.Y. Mar. 5, 2018) ("Courts are divided as to whether a single instance of denial of overtime constitutes a materially adverse employment action."), *report and recommendation adopted as modified*, 2018 WL 1505565 (E.D.N.Y. Mar. 27, 2018).

to the level of a discrete act that could dissuade a reasonable person from pursuing statutory rights. *See Bundschuh v. Inn on the Lake Hudson Hotels, LLC*, 914 F. Supp. 2d 395, 406 (W.D.N.Y. 2012). But Balcer's alleged conduct in this case was in the context of a correctional facility with rules about how counseling should be performed, presumably to maintain order and cohesion in a hierarchical system. Balcer's alleged deviation from those rules was arguably more than just personally offensive; it undermined David's authority. Indeed, David alleges that his colleagues took notice and "warned" him that Balcer was "targeting" him. (Doc. 36-5 ¶ 181.) Moreover, all of Balcer's alleged conduct must be considered as a whole. The court concludes that David's allegations of a retaliatory hostile environment created by Balcer are sufficient to survive Rule 12(b)(6).[11]

### B.   Against Hersperger

Hersperger first argues that it is unclear whether Plaintiffs are bringing their § 1983 claim under a "disparate treatment" or a "hostile work environment" theory. (Doc. 29-1 at 8.) As noted above, a § 1983 plaintiff may allege both such claims. *Naumovski*, 934 F.3d at 212. But "[h]ostile work environment claims are merely a subset of disparate treatment claims." *Murphy v. Bd. of Educ. of Rochester City Sch. Dist.*, 273 F. Supp. 2d 292, 312 (W.D.N.Y. 2003). Since Plaintiffs are claiming a hostile work environment, they are necessarily also claiming disparate treatment. The court proceeds to consider Hersperger's argument that Plaintiffs have failed to state a claim under either theory.

---

[11] Based on this conclusion, the court rejects Balcer's argument (Doc. 39 at 15) that lack of "adverse employment action" precludes David's NYSHRL retaliation claim against him. The court addresses other issues with the NYSHRL claims below.

### 1.    Group Pleading

Hersperger argues that the Complaint should be dismissed because it relies on impermissible "group pleading" against all defendants.  (Doc. 29-1 at 8.)  The court observes that the proposed Amended Complaint breaks up the § 1983 claims into separate counts and specifies precisely which plaintiff is asserting which claim against which defendants.  (*See* Doc. 36-5.)  To the extent that modification to the pleading does not moot Hersperger's argument on this point, the court rejects Hersperger's contention for the following reasons.

Importantly, § 1983 does not permit vicarious liability; to be liable under § 1983, an individual defendant must have "*personally* violated a plaintiff's constitutional rights." *Naumovski*, 934 F.3d at 212 (quoting *Raspardo v. Carlone*, 770 F.3d 97, 115 (2d Cir. 2014)). And "[b]ecause the personal involvement of a defendant is a prerequisite to an award of damages under § 1983, a plaintiff cannot rely on a group pleading against all defendants without making specific individual factual allegations." *Wyatt v. Kozlowski*, No. 19-CV-159W(F), 2021 WL 130978, at *7 (W.D.N.Y. Jan. 14, 2021) (quoting *Spring v. Allegany-Limestone Cent. Sch. Dist.*, 138 F. Supp. 3d 282, 293 (W.D.N.Y. 2015), *vacated in part on other grounds*, 655 F. App'x 25 (2d Cir. 2016)).  "Such 'group pleading' violates Fed. R. Civ. P. 8(a)'s requirement that a pleading 'give each defendant fair notice of the claims against it.'"  *Id.* (quoting *Holmes v. Allstate Corp.*, No. 11 Civ. 1543(LTS)(DF), 2012 WL 627238, at *22 (S.D.N.Y. Jan. 27, 2012), *report and recommendation adopted*, 2012 WL 626262 (S.D.N.Y. Feb. 27, 2012)).  On the other hand, "[n]othing in Rule 8 prohibits collectively referring to multiple defendants where the complaint alerts defendants that identical claims are asserted against each defendant."  *Id.* (alteration in original) (quoting *Ausco Prods., Inc. v. Axle, Inc.*, No. 6:19-CV-06798 EAW, 2020 WL 7028521, at *2 (W.D.N.Y. Nov. 30, 2020)).

Here, the original Complaint does refer to "defendants" as a group in multiple instances. But, as in *Wyatt*, the Complaint does not "lump all the defendants together in each claim and provide no factual basis to distinguish their conduct." *Id.* at *8 (quoting *Atuahene v. City of Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001)). As to Hersperger, the Complaint alleges that he made inappropriate sexual and gender-based comments about Leslie in or around August or September 2017. (Doc. 2 ¶ 28.) After David confronted Hersperger about that conduct, "Leslie experienced ongoing harassment and retaliation by Lt. Hersperger," including instances where Hersperger "verbally berat[ed]" her and "referr[ed] to her with gendered obscenities." (*Id.* ¶¶ 31–32.)

The Complaint also alleges that, after taking part in an internal investigation into Hersperger's conduct, David faced "a series of retaliatory actions by Supt. Sticht, Lt. Hersperger, Capt. Balcer and DDS Yehl that continue to this day." (*Id.* ¶ 64.) In particular, the Complaint alleges, among other things, that Hersperger assigned David overtime on March 21, 2019 without telling him (*id.* ¶ 73) and "tried to set up David and Leslie so they would be disciplined or fired; made false and disparaging comments about Leslie and David to their co-workers; created a hostile work environment for them; and refused to communicate with David about his schedule, making it impossible for David to do his job." (*Id.* ¶ 75.) These allegations against Hersperger are specific, and the Complaint is not deficient merely for asserting identical theories against multiple defendants.

### 2.    Retaliation

As noted above, the § 1983 claims include a retaliation theory. (*See* Doc. 2 ¶ 172 (incorporating allegations of retaliation).) Hersperger's motion to dismiss those claims focuses on "disparate treatment" and "hostile work environment" theories without explicitly discussing

the "retaliation" theory. (*See* Doc. 29-1 at 7.)  However, Hersperger adopts the arguments raised in his co-defendants' motion. (*Id.* at 3.)  The court accordingly concludes that Hersperger—like his co-defendants—attacks Plaintiffs' retaliation theory on the grounds that Plaintiffs have failed to plausibly allege any "adverse employment action."

The court rejects that argument for reasons similar to those stated above as to Hersperger's co-defendants.  As summarized above, the Complaint includes multiple specific allegations of plausibly retaliatory conduct by Hersperger after David confronted him about his August or September 2017 statements.  "[A] retaliatory hostile work environment constitutes an adverse action, for purposes of a retaliation claim." *Tromblee*, 2021 WL 981847, at *10.  This conclusion illuminates the analysis of Hersperger's argument for dismissal of Plaintiffs' hostile-environment claim, which the court discusses next.

### 3.    Hostile Environment

Hersperger argues that Plaintiffs have failed to state a § 1983 claim on a hostile work environment theory because, in his view, the allegations do not demonstrate that Plaintiffs' workplace "was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of . . . employment were thereby altered." *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002).  Plaintiffs maintain that they have adequately alleged that Hersperger "created a hostile work environment and took adverse employment actions against them, on his own and in concert with the Individual Defendants." (Doc. 33 at 17.)

To state a claim for a hostile work environment, "a plaintiff must allege facts to plausibly 'show that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment.'" *Felton v. Monroe Cmty. Coll.*, 6:20-CV-06156 EAW, 2021 WL

1132411, at *11 (W.D.N.Y. Mar. 24, 2021) (quoting *Erno v. N.Y.S. Office of Info. Tech. Servs.*,

No. 1:19-CV-1457 (NAM/TWD), 2020 WL 2736563, at *7 (N.D.N.Y. May 26, 2020)).

> In considering a hostile work environment claim, the Court must look to the record as a whole and assess the totality of the circumstances, and generally, unless an incident of harassment is sufficiently severe, incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive. The Court should consider a variety of factors including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.

*Id.* (cleaned up). This is a high standard. At the same time, "the Second Circuit has repeatedly

cautioned against setting the bar too high in this context." *Id.* (cleaned up). "[T]he fact that the

law requires harassment to be severe or pervasive before it can be actionable does not mean that

employers are free from liability in all but the most egregious cases." *Terry v. Ashcroft*,

336 F.3d 128, 148 (2d Cir. 2003) (quoting *Whidbee v. Garzarelli Food Specialties, Inc.*,

223 F.3d 62, 70 (2d Cir. 2000)).

If the court limited its analysis to Hersperger's alleged August or September 2017

statement, it might conclude that the statement alone did not create a hostile work environment.

*See MacMaster v. City of Rochester*, No. 05-CV-6509, 2007 WL 2892015, at *9 (W.D.N.Y.

Sept. 28, 2007) (telling the plaintiff that she "would look hot" in coveralls and "persistently

putting his arm on her shoulder when speaking to her in an office setting" was "indisputably

boorish and offensive behavior" but was not, "standing alone, so extraordinarily severe as to be

actionable" as sexual harassment based on a hostile work environment); *see also Alfano*,

294 F.3d at 374 ("Isolated acts, unless very serious, do not meet the threshold of severity or

pervasiveness."). But the court must consider the totality of the circumstances alleged in the

Complaint. As alleged in the Complaint, Hersperger's offensive conduct began with the 2017

statement. Although that statement was made outside Leslie's presence, the Complaint alleges

that after David learned of the statement and confronted Hersperger, Hersperger engaged in additional offensive conduct including "verbally berating Leslie and referring to her with gendered obscenities." (Doc. 2 ¶ 32.)

In addition to the conduct directed at David summarized briefly above, the Complaint alleges the following conduct directed at Leslie:

- On June 13, 2018, Hersperger "screamed at and threatened Leslie for a purported mistake in prisoner count." (*Id.* ¶ 33.)

- On June 26, 2018, Hersperger yelled about Leslie in front of her coworkers, claiming that there was an error in the prisoner count, stating: "[T]hat fucking Leslie Stevenson.  When is that bitch gonna learn she can't make her own count up?" (*Id.* ¶¶ 35–36.)

- On September 28, 2018, when Leslie entered office where Hersperger was present, he "began noticeably ogling her, pointedly looking at her body, moving his eyes up and down the length of her body, and making it visibly clear that he was looking at her full body from her head to her feet." (*Id.* ¶ 38.)

- On January 10, 2019, Hersperger told Sgt. John Wahr that Leslie was not permitted to be scheduled in "the front" (a desirable assignment) because "this was Lt. Hersperger's area." (*Id.* ¶ 42.)

- On January 16, 2019, Leslie was working in the lobby as scheduled when, acting on Hersperger's directions, Sgt. Wahr told Leslie she was removed from the lobby assignment because she "was not wearing the appropriate uniform." (*Id.* ¶¶ 44–45.)

- Hersperger "continued to change Leslie's jobs and assignments to prevent her from having the more desirable jobs." (*Id.* ¶ 50.)

- On March 8, 2019, after Leslie had made a formal complaint about Hersperger's conduct, Hersperger "refused to share information regarding a transportation issue with Leslie"—he "called the compound gate post, where Leslie was stationed, and hung up the phone once he realized that Leslie was assigned there." (*Id.* ¶ 62.)

- At a meeting on March 17, 2019, Sgt. Wahr recommended to Hersperger that Leslie be selected to fill a vacant "up front" assignment.  Hersperger responded with words to the effect of "she will never work up here." (*Id.* ¶¶ 65–66.)

- Also on March 17, 2019, Hersperger learned that Leslie had filed a formal complaint against him, and in response he "became physically and verbally aggressive by slamming doors and yelling." (*Id.* ¶ 68.)

- On August 5, 2019, Hersperger "became irate, threw objects, and disparaged Leslie during her shift." (*Id.* ¶ 82.)  The following day he refused to speak to Leslie at all, making it "almost impossible" for Leslie to safely fulfill her job duties. (*Id.* ¶ 83.)

- On February 22, 2020, Leslie encountered Hersperger in the chart office and Hersperger "became physically threatening and hostile, slamming doors, kicking a garbage can and throwing things into boxes." (*Id.* ¶ 100.)

- In December 2020, while Leslie was working light duty after returning from medical leave, Hersperger reported her for violating policy by leaving work early.  He believed that someone on light duty must work from 7:00 a.m. to 3:00 p.m., whereas Leslie worked from 6:15 a.m. to 2:30 p.m., which are the regular hours for arsenal employees. (*Id.* ¶¶ 124–26.)

- On February 23, 2021, as Leslie was giving a tour to new officers, Hersperger yelled "don't believe a fucking word she says" as she walked through the administration building. (*Id.* ¶ 139.)

Hersperger asserts that these allegations establish only two brief remarks that were facially gendered—occurring 10 months apart and not directed to Leslie—and that the allegations "mostly describe efforts taken by Lt. Hersperger to enforce Leslie's compliance with DOCCS uniform rules, ensure accurate prisoner counts, and his understandable efforts to minimize the occasions in which he interacted with plaintiffs in the midst of their multiple, pending complaints of workplace discrimination." (Doc. 29-1 at 3–4.)

Insofar as the conduct being evaluated is sexual comments or gestures, then the court agrees that the allegations fall short of a hostile environment claim based on such conduct. The only conduct of an overtly sexual nature alleged in the Complaint is: (1) Hersperger's August or September 2017 statement that referred to her as a "hot, sexy, female C.O."; (2) the June 26, 2018 statement referring to Leslie as a "bitch"; (3) the September 28, 2018 "ogling" incident. These three incidents—each separated by several months—were relatively infrequent. The three incidents were not expressly threatening and did not, by themselves, interfere with Leslie's work performance. Neither statement is sufficiently severe to alter the conditions of employment. *See Perry v. John A. Guerrieri, DDS PLLC*, No. 18-CV-6443L, 2021 WL 480239, at *6 (W.D.N.Y. Feb. 10, 2021) (quoting *Beale v. Mount Vernon Police Dep't*, 895 F. Supp. 2d 576, 588 (S.D.N.Y. 2012)) (reference to female coworker as a "bitch" was "sophomoric and boorish" but not sufficiently severe or pervasive to alter conditions of employment), *appeal withdrawn*, No. 21-587 (2d Cir. June 22, 2021). The single "ogling" incident was also unwelcome but not particularly severe. *See Cristofaro v. Lake Shore Cent. Sch. Dist.*, No. 06-CV-0487S, 2011 WL

635263, at *7 (W.D.N.Y. Feb. 11, 2011) (citing *Lamar v. Nynex Serv. Co.*, 891 F. Supp. 184, 185 (S.D.N.Y. 1995)) (touching plaintiff's hand, comments that she looked "hot," and staring at her were too mild to constitute sexual harassment).

On the other hand, as discussed above, Plaintiffs are claiming a *retaliatory* hostile environment. This is an element of a retaliation claim. The alleged events between 2017 and 2021—some of which are recited above—are more than sufficient to support a plausible retaliatory hostile environment. The retaliation claim against Hersperger survives his motion to dismiss for the reasons stated above.

### 4.    Disparate Treatment

Hersperger argues at some length that Plaintiffs have failed to state a § 1983 claim on a disparate treatment theory. (*See* Doc. 29-1 at 8–10.) He maintains that the Complaint lacks any allegations of similarly situated persons that were treated more favorably than Leslie. It is true that, to state a § 1983 disparate treatment claim the plaintiff must generally "plead facts sufficiently plausible to establish that she was treated differently than *similarly situated employees* because of her gender by a person acting under color of state law." *Fox v. Cnty. of Yates*, No. 10-CV-6020, 2010 WL 4616665, at *9 (W.D.N.Y. Nov. 12, 2010) (emphasis added); *see also Preston v. Hilton Cent. Sch. Dist.*, 876 F. Supp. 2d 235, 245 (W.D.N.Y. 2012) (Section 1983 equal protection claim based on alleged deliberate indifference to discriminatory harassment did not survive Rule 12(b)(6) because the complaint lacked allegations "that similarly-situated students who suffered peer-on-peer harassment were ever treated differently from A.P., as a result of his protected status—here, his male gender").

However, as noted above, "retaliation is a form of discrimination." *Vega*, 801 F.3d at 82. When a worker is subjected to retaliation, "the complainant is being subjected to differential

treatment." *Id.* (quoting *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174 (2005)).
Certainly a plaintiff "may establish an indirect inference of causation in the retaliation context
through the identification of similarly situated comparators." *Alexander v. N.Y.C. Dep't of
Educ.*, No. 19-cv-7023 (AJN), 2020 WL 7027509, at *11 (S.D.N.Y. Nov. 30, 2020). But
Hersperger cites no authority suggesting that that is the *only* way to establish causation or any
other required element in the retaliation context. *See Olivier v. Cnty. of Rockland*, No. 15-CV-
8337 (KMK), 2019 WL 2502349, at *26 n.34 (S.D.N.Y. June 17, 2019) ("Defendants do not,
however, cite to any caselaw, and the Court is not aware of any, that states that a plaintiff in a
retaliation case must introduce evidence of a similarly situated comparator to establish pretext.").

## IV.    Section 1985 Claims

David also brings claims under 42 U.S.C. § 1985(3) against Hersperger and Balcer for an
alleged conspiracy to deprive him of equal protection. Plaintiffs claim that Hersperger and
Balcer conspired to get David fired or transferred and "to deprive David of his right to equal
protection under the law because David engaged in advocacy for the rights of women to be free
from sex and gender-based harassment in their workplace." (Doc. 2 ¶¶ 93, 99, 185, 186.) There
is no dispute regarding the elements of a § 1985(3) claim:

> A conspiracy claim under Section 1985(3) requires a plaintiff to allege: "1) a
> conspiracy; 2) for the purpose of depriving, either directly or indirectly, any person
> or class of persons of the equal protection of the laws, or of equal privileges and
> immunities under the laws; and 3) an act in furtherance of the conspiracy;
> 4) whereby a person is either injured in his person or property or deprived of any
> right or privilege of a citizen of the United States."

*Dolan v. Connolly*, 794 F.3d 290, 296 (2d Cir. 2015) (quoting *Britt v. Garcia*, 457 F.3d 264, 269
n.4 (2d Cir. 2006)). Hersperger and Balcer separately move for dismissal of the § 1985(3) claim
against them on a variety of overlapping grounds, which the court considers as to both of those
defendants below.

27

A.    *Sherlock* and *Novotny*

Relying on *Sherlock v. Montefiore Medical Center*, 84 F.3d 522 (2d Cir. 1996), and

*Great American Federal Savings & Loan Ass'n v. Novotny*, 442 U.S. 366 (1979), Hersperger and

Balcer both argue that David cannot raise a § 1985(3) claim against them for any alleged

violation of rights created by Title VII.  (Doc. 29-1 at 13; Doc. 34 at 6.)[12]  The Second Circuit in

*Sherlock* observed that the Supreme Court in *Novotny* held "that in light of the enforcement and

conciliation mechanism created by Congress for claims under Title VII . . ., the 'deprivation of a

right created by Title VII cannot be the basis for a cause of action under § 1985(3).'"  *Sherlock*,

84 F.3d at 527 (quoting *Novotny*, 442 U.S. at 378).

Plaintiffs do not address this issue in their opposition memos.  The court therefore

concludes that Plaintiffs concede this point.  *See Schafer v. Coyne*, No. 12-CV-00040-RJA-JJM,

2017 WL 975895, at *3 (W.D.N.Y. Mar. 14, 2017) (quoting *SEC v. Syron*, 934 F. Supp. 2d 609,

631 (S.D.N.Y. 2013)) ("[A] plaintiff who does not respond to a point raised by a defendant on a

motion to dismiss concedes that point through silence.").  But this concession is a narrow one

because Defendants seek dismissal on this theory only insofar as the § 1985(3) claim is for

alleged violations of rights created by Title VII, whereas David's conspiracy claim is *also*

premised on a conspiracy to violate his rights under the Equal Protection Clause.

The court therefore concludes that it would be error to dismiss the § 1985(3) claim in this

case on the basis of *Sherlock* and *Novotny*.  Indeed, the *Sherlock* court did not rely on *Novotny* to

dismiss the § 1983 claim in that case.  Other decisions are in accord.  *See Donlon v. Bd. of Educ.*

---

[12] Although Hersperger raises this argument in his motion to dismiss, Balcer raises it for
the first time in his reply.  The court considers the argument as to both defendants here since
Hersperger's motion fairly placed the issue in contention and David has had an opportunity to
oppose it.

*of Greece Cent. Sch. Dist.*, No. 06-CV-6027T, 2007 WL 4553932, at *3–4 (W.D.N.Y. Dec. 20,

2007) (recognizing that the holding in *Novotny* permits bringing a § 1983 action seeking redress

for independent constitutional violations, and declining to apply *Novotny* to dismiss § 1983 equal

protection claims based on hostile work environment, age discrimination, and retaliation); *Trigg*

*v. N.Y.C. Transit Auth.*, No. 99-CV-4730 (ILG), 2001 WL 868336, at *12 (E.D.N.Y. July 26,

2001) (applying *Novotny* to dismiss portion of § 1985(3) claim based on alleged deprivation of

Title VII rights, but not relying on *Novotny* to dismiss portion of § 1985(3) claim based on

alleged violations covered by § 1983).

   B.   **Intracorporate Conspiracy Doctrine**

   The "intracorporate conspiracy doctrine" holds that "because employees acting within the

scope of their employment are agents of their employer, an employer and its employees are

generally considered to be a single actor, rather than multiple conspirators." *Fed. Ins. Co. v.*

*United States*, 882 F.3d 348, 368 (2d Cir. 2018).  The Second Circuit has extended the doctrine

"to the context of conspiracies to interfere with civil rights in violation of 42 U.S.C. § 1985." *Id.*

at 368 n.14 (citing *Girard v. 94th St. & Fifth Ave. Corp.*, 530 F.2d 66, 70 (2d Cir. 1976)).  The

doctrine has been held to apply when the entity is a state.  *Vega v. Artus*, 610 F. Supp. 2d 185,

205 (N.D.N.Y. 2009).

   But courts in this circuit recognize a "personal stake" exception to the doctrine.  *See id.*

(citing *Brever v. Rockwell Int'l Corp.*, 40 F.3d 1119, 1127 (10th Cir. 1994)); *see also Mazyck v.*

*Keller*, No. 6:20-CV-06055 EAW, 2021 WL 1201224, at *10 (W.D.N.Y. Mar. 31, 2021)

(quoting *Ali v. Connick*, 136 F. Supp. 3d 270, 282 (E.D.N.Y. 2015)) (noting that under the

"personal stake exception, the intracorporate conspiracy doctrine does not apply to bar

conspiracy claims against individuals with a single entity when they are pursuing personal

interests wholly separate and apart from the entity"); *Calvelos v. City of N.Y.*, No. 19 civ. 6629
(CM), 2020 WL 3414886, at *17 (S.D.N.Y. June 22, 2020) (noting "independent personal stake"
exception); *Colon v. City of Rochester*, 419 F. Supp. 3d 586, 595 (W.D.N.Y. 2019) (noting same
"narrow exception"); *Richard v. Fischer*, 38 F. Supp. 3d 340, 353 (W.D.N.Y. 2014) (same).
"However, 'in order to allege facts plausibly suggesting that individuals were pursuing personal
interests wholly separate and apart from the entity, more is required of a plaintiff than simply
alleging that the defendants were motivated by personal bias against the plaintiff.'" *Artus*,
610 F. Supp. 2d at 205 (quoting *Cusamano v. Sobek*, 604 F. Supp. 2d 416, 470 (N.D.N.Y.
2009)).

The parties disagree as to whether the "personal stake" exception applies in this case.
Balcer and Hersperger argue that Plaintiffs have not attributed their actions to any personal
motives separate and distinct from the workplace.  (Doc. 19-1 at 10; Doc. 29-1 at 13.)  Relying
on *Calvelos*, Plaintiffs maintain that each individual defendant "had his own personal stake in
conspiring to deprive David of his constitutional rights."  (Doc. 32 at 24.)  They contend that
Balcer wanted "to prevent David from exposing the institution's problems" (*id.*) and that
Hersperger sought "to prevent David from exposing his misconduct in subverting the
investigations and violating DOCCS's policies" (Doc. 33 at 23–24).  Balcer disagrees, arguing
that (1) unlike the complaint in *Calvelos*, "nothing about Defendant Balcer's purported personal
motivations is set forth in the actual complaint" and that (2) "Plaintiffs fail to raise any
nonconclusory allegations that plausibly suggest Defendant Balcer was pursuing interests that

were wholly separate from the other individual defendants, the agency/DOCCS, and/or his employment with DOCCS."  (Doc. 34 at 7–8 & n.3.)[13]

It is true that the complaint in *Calvelos* included explicit allegations that the defendant warden conspired to instigate the plaintiff's termination and did so with discriminatory intent and also to "shield against discipline, prosecution, and civil liability."  *Calvelos*, 2020 WL 3414886, at *17.  In contrast, Plaintiffs' pleadings do not articulate any similar explicit personal motivation as to any defendant in this case.  The first time that Plaintiffs have directly articulated these alleged personal motivations is in their opposition papers.

Of course, in the Rule 12(b)(6) context, the court must draw reasonable inferences in Plaintiffs' favor.  But Plaintiffs' allegations do not support the inferences that they seek.  As to Balcer, there are no allegations that he perceived any of the events at issue to be institutional problems or that retaliating against, transferring, or terminating David would prevent David from exposing any such problems.  As to Hersperger, the allegations do not suggest that he viewed any of his actions as misconduct or that retaliating against, transferring, or terminating David would prevent a review of that question.  To the contrary, the Complaint alleges that Balcer and Hersperger conspired together "because David engaged in advocacy for the rights of women to be free from sex and gender-based harassment in their workplace."  (Doc. 2 ¶ 185.)  This is an allegation that these two defendants were motivated to retaliate—a form of discrimination.  More would be required to plausibly suggest that they were pursuing separate personal interests.  *Artus*, 610 F. Supp. 2d at 205 (quoting *Cusamano*, 604 F. Supp. 2d at 470).

---

[13] Hersperger's reply memorandum does not address the intracorporate conspiracy doctrine, but the court presumes that his arguments on this issue are the same as Balcer's.

The court concludes that the intracorporate conspiracy doctrine applies and that it bars Plaintiffs' § 1985 claims against Balcer and Hersperger.  The conclusion makes it unnecessary to reach the remaining arguments for dismissal of those claims against those defendants.

## V.      Defamation Claims

The defamation count is brought against Balcer and Hersperger.  The defamation claims include the following allegations:

> 191.    Lt. Hersperger made false statements to third parties for the purpose of shaming, disgracing and ostracizing Leslie when he yelled out "don't believe a fucking [word] she says" to new officers as described above.

> 192.    Cpt. Balcer made false statements to third parties for the purpose of shaming, disgracing and ostracizing David when he told Sgt. Walker that David had acted inappropriately during a shift as described above.

> 193.    Lt. Hersperger and Capt. Balcer made false statements to third parties for the purpose of shaming, disgracing and ostracizing David when they falsely accused him of acting in a manner contrary [to] Covid-19 protocols as described above and when they told David's coworkers that David was taking pictures of sergeants in the parking lot in order to catch people leaving early as further described above.

(Doc. 2 ¶¶ 191–193.)  Plaintiffs claim that these statements "injured plaintiffs in their profession and are therefore statements that constitute defamation *per se*."  (*Id.* ¶ 197.)  They also claim that the statements caused "damage to their reputation in their profession and the community; severe emotional distress and mental anguish; degradation; embarrassment; and punitive or exemplary damages."  (*Id.* ¶ 198.)

"Under New York law, defamation comprises both slander (for injurious spoken statements) and libel (for injurious written statements)."  *Oakley v. Dolan*, 833 F. App'x 896, 899 (2d Cir. 2020) (summary order).  "Both types of claims require pleading the same basic elements: (1) a defamatory statement of fact about the plaintiff; (2) publication to a third party; (3) fault by the defendant; (4) falsity of the statement; and (5) special damages or per se

actionability." *Id.* (citing *Palin v. N.Y. Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019) (libel), and

*Sleepy's LLC v. Select Comfort Wholesale Corp.*, 909 F.3d 519, 528 (2d Cir. 2018) (slander)).

Balcer and Hersperger argue that Plaintiffs' allegations fail to establish one or more of these

elements.[14]  The court considers their arguments in turn.

### A.    Against Balcer

#### 1.    Statement that David Acted "Inappropriately"

According to the Complaint, "[o]n March 23, 2020, Capt. Balcer belittled David during a

conversation he had with Sergeant Jeffery Walker." (Doc. 2 ¶ 106.)  Balcer allegedly suggested

to Walker that David had acted "inappropriately" during a shift.  (*Id.* ¶ 192.)  "Sgt. Walker

reported this highly unusual activity to David as David is of a higher rank than, and supervised,

Sgt. Walker."  (*Id.* ¶ 107.)

Balcer notes that, under New York law, "[s]tatements of pure opinion are . . . not

defamatory." *Wellsville Manor, LLC v. Campbell*, No. 1:20-cv-000621, 2020 WL 7180987,

at *3 (W.D.N.Y. Dec. 7, 2020) (ellipsis in original) (quoting *Grayson v. Ressler & Ressler*,

271 F. Supp. 3d 501, 516 (S.D.N.Y. 2017)).  He argues that his alleged statement to a coworker

that David acted "inappropriately" is such a statement of pure opinion.  (Doc. 19-1 at 12.)

Relying on *Tosti v. Silver Star Auto Resources LLC*, No. 18-cv-06640 (DLI)(CLP), 2020 WL

---

[14] In opposing Hersperger's motion, Plaintiffs summarize the motion as seeking dismissal of "all causes of action against him *with the exception of that portion of plaintiffs' Sixth Cause of Action related to the defamatory statements he made about David*."  (Doc. 33 at 7 (emphasis added).)  In his reply, Hersperger describes that statement as inexplicable, noting that his motion specifically seeks dismissal of the defamation claims against him.  (*See* Doc. 35 at 5.)  The court concludes that, even if the quoted summary of Hersperger's motion is inaccurate or inexplicable, the plausibility of the defamation claims against Hersperger is squarely before the court on Hersperger's motion (*see* Doc. 29-1 at 14) and is fully briefed on the merits in Plaintiffs' opposition (*see* Doc. 33 at 24).

5912398 (E.D.N.Y. Oct. 6, 2020), David maintains that "[s]tatements identifying a person as the

source of issues at his place of employment survive motions to dismiss." (Doc. 32 at 26.)

The court begins with an important preliminary issue. "New York state law requires that,

'[i]n an action for libel or slander, the *particular* words complained of shall be set forth in the

complaint.'" *Tannerite Sports, LLC v. NBCUniversal News Grp., a Div. of NBCUniversal*

*Media, LLC*, 864 F.3d 236, 251 n.10 (2d Cir. 2017) (alteration in original) (quoting *Nowak v.*

*EGW Home Care, Inc.*, 82 F. Supp. 2d 101, 113 (W.D.N.Y. 2000)). That strict pleading standard

does not govern in this federal case. *See id.*; *see also Tosti*, 2020 WL 5912398, at *3 ("[F]ederal

courts only require that the alleged defamatory statements be pleaded with sufficient specificity

to put the defendants on notice.") (internal quotation marks omitted). Still, the federal rules

require that a defamation defendant "receiv[e] proper notice of a defamation claim." *Tannerite*,

864 F.3d at 251 n.10; *see also Sebastiani v. Brooklyn Hosp. Ctr.*, No. 19-CV-253 (PKC) (ST),

2019 WL 3281010, at *5 (E.D.N.Y. July 19, 2019) (allegations must adequately identify the

defamatory statements that were made). "Vagueness as to the complained-of conduct is

particularly inappropriate when pleading a defamation claim." *Tannerite*, 864 F.3d at 251.

The court concludes that the allegations in the defamation count regarding Balcer's

March 23, 2020 statement are not sufficiently specific. Even though the federal pleading

standards do not require a verbatim recitation of the particular words used, the allegation that

Balcer "belittled" David by suggesting he had acted "inappropriately" during a shift lacks the

required particularity. *See ADYB Engineered for Life, Inc. v. Edan Admin. Servs. Ltd.*, No. 1:19-

cv-7800-MKV, 2021 WL 1177532, at *25 (S.D.N.Y. Mar. 29, 2021) (general allegations that

counterclaim defendant "made accusations of fraudulent behavior, lying, and dishonesty are not

sufficiently particularized to sustain a claim for libel"); *cf. Tosti*, 2020 WL 5912398, at *3

34

(allegations of specific fraudulent and illegal acts "sufficiently [gave] Defendants notice of the purported defamation"); *Sebastiani*, 2019 WL 3281010, at *5 (allegations adequately identified alleged defamatory statements as "statements indicating that Plaintiff had engaged in fraudulent billing practices and worked outside the scope of his practice").  David does not dispute the factors relevant to whether a statement is an opinion or fact,[15] and it is impossible to apply those factors to the vague and generalized allegations at issue here.  The court will dismiss this portion of the defamation count against Balcer.

## 2.   Accusation of Violating COVID-19 Protocols; Photographing Sergeants in the Parking Lot

The defamation count includes an allegation that, on September 29, 2020, "David became aware that the Office of Special Investigations was looking into an anonymous allegation lodged by someone who worked at Wyoming that falsely accused David of acting in contradiction of COVID-19 protocols."  (Doc. 2 ¶ 119.)  According to the Complaint: "Upon information and belief, Capt. Balcer or Lt. Hersperger made this complaint."  (*Id.* ¶ 120.)  The defamation count also includes an allegation that, around December 2020, two of David's coworkers, officers Steven Hartwig and Keith Kurek, told him "that they had been told by a 'supervisor' that David was in the parking lot with a camera trying to catch sergeants leaving early for the purpose of having them written up."  (*Id.* ¶ 132.)  The Complaint alleges that "[u]pon information and

---

[15] As stated in *Wellsville*, 2020 WL 7180987, at *3, those factors are:

(1) whether the language has a precise meaning which is "readily understood" or whether it is "indefinite and ambiguous;" (2) whether the statement is capable of being objectively characterized as true or false; (3) an examination of the full context of the communication; and (4) "consideration of the broader social context or setting surrounding the communication[.]"

(brackets in original) (quoting *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 402 n.7 (2d Cir. 2006)).

belief, the supervisor who spoke to C.O.s Hartwig and Kurek was either Lt. Hersperger or Capt. Balcer." (*Id.* ¶ 133.)  The supervisor's accusation was, according to the Complaint, "completely false." (*Id.* ¶ 134.)  David alleges that the statements were made "with actual malice." (*Id.* ¶ 196.)

Balcer argues that these allegations are conclusory and fail to meet the applicable pleading standards.  (Doc. 19-1 at 13–14.)  He also asserts that he is entitled to the qualified "common interest" privilege to make the alleged statements.  (*Id.* at 14.)  David maintains that the Complaint adequately describes the nature, content, and context of the statements, and that the "common interest" defense is overcome by allegations that the statement was made with malice.  (Doc. 32 at 28.)

The court concludes that—assuming the statements at issue are defamatory—they are protected by the "common interest" privilege.  New York law concerning this privilege is well settled:

> Under the principle that the flow of information between persons sharing a common interest should not be impeded, a qualified "common interest" privilege arises when a person makes a good-faith, bona fide communication upon a subject in which he or she has an interest, or a legal, moral or societal interest to speak, and the communication is made to a person with a corresponding interest.  Qualified privilege has been applied to statements among employees of an organization in furtherance of the common interest of their employer.

> In order to overcome the qualified privilege, a plaintiff must demonstrate by tender of proof in evidentiary form that a defendant acted with malice.  To demonstrate what has become known as constitutional malice, [a] plaintiff must show that [the defendant] acted with knowledge that her statements were false or with reckless disregard of whether they were false, i.e., that the statements were made with a high degree of awareness of their probable falsity or that [the defendant] entertained serious doubts as to their truth. Common-law malice, which will also defeat a qualified privilege, requires proof that the speaker was motivated solely by spite or ill will.

*Routh v. Univ. of Rochester*, 981 F. Supp. 2d 184, 213 (W.D.N.Y. 2013) (alterations in original) (quoting *Sanderson v. Bellevue Maternity Hosp. Inc.*, 259 A.D.2d 888, 889–90, 686 N.Y.S.2d 535, 537 (3d Dept. 1999)).

David advances two arguments against application of the common interest privilege. First, he argues that the privilege is an affirmative defense that "does not lend itself to a pre-answer motion to dismiss." (Doc. 32 at 28.) It is true that when "affirmative defenses require consideration of facts outside of the complaint they are inappropriate to resolve on a motion to dismiss." *Routh*, 981 F. Supp. 2d at 213 (cleaned up). But an affirmative defense such as the common interest privilege may be adjudicated under Rule 12(b)(6) "where the facts necessary to establish the defense are evident on the face of the complaint." *Id.* (quoting *Kelly-Brown v. Winfrey*, 717 F.3d 295, 308 (2d Cir. 2013)). David does not dispute that the statements at issue were among DOCCS employees and that the statements related to institutional health and safety (the COVID-19 accusation) and personnel issues (the parking lot accusation)—both of which are within the common interest of the employer.

Instead, David relies on his second argument: that he has adequately pled "malice." (Doc. 32 at 28.) The Complaint does allege that the statements were made "with actual malice and the intent to harm plaintiffs in their profession." (Doc. 2 ¶ 196.) But that allegation is a legal conclusion; it merely recites the legal standard. *See Biro v. Condé Nast*, 963 F. Supp. 2d 255, 279–80 (S.D.N.Y. 2013) ("[P]leading 'actual-malice buzzwords' is simply not enough to nudge a case into discovery."). The court disregards such conclusory allegations and focuses on whether the allegations of fact "permit[] the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Shay v. Walters*, 702 F.3d 76, 82–83 (1st Cir. 2012)).

Plaintiffs could defeat the motion to dismiss this component of the defamation claim by alleging that Balcer knowingly transmitted false information (constitutional malice) or that he was motived solely by spite or ill will (common-law malice). *See Viehdeffer v. Tryon*, No. 12-CV-23S, 2012 WL 3746372, at *13 (W.D.N.Y. Aug. 28, 2012) (recognizing that, at the Rule 12(b)(6) stage, the plaintiff could defeat common interest privilege by alleging that the defendant knowingly transmitted false information). The Complaint lacks factual allegations supporting either theory. Although the Complaint alleges that Balcer's accusations were false, there are no factual allegations to support an inference that Balcer *knew* they were false. Moreover, while the Complaint's allegations of retaliation might suggest that Balcer was motivated in part by spite or ill will, the court cannot infer that this was his *sole* motivation.

### B.    Against Hersperger

#### 1.    "Don't Believe a Word She Says"

As noted above, the Complaint alleges that "[o]n February 23, 2021, as Leslie was giving a tour to new officers, Hersperger yelled 'don't believe a fucking word she says' as she walked through the administration building." (Doc. 2 ¶ 139.) Hersperger argues that no reasonable person would interpret that as a statement of fact. (Doc. 29-1 at 14.) Leslie asserts that the alleged statement "indirectly called her a liar" and argues that courts have recognized references to a plaintiff as a "liar" as actionable. (Doc. 33 at 25.)

The court agrees with Leslie that courts in some cases have found "defamatory quality in assertions that the plaintiff is a liar." Dan B. Dobbs et al., *The Law of Torts* § 525 (2d ed.). But context matters in such cases; some "liar" accusations are pure opinions. *See Edwards v. Nat'l Audubon Soc'y, Inc.*, 556 F.2d 113, 121 (2d Cir. 1977) ("The epithet 'liar' in this context, standing by itself, merely expressed the opinion that anyone who persisted in misusing Audubon

statistics after being forewarned could not be intellectually honest."). The court accordingly refers to the factors useful for determining whether a statement is one of opinion or fact:

> (1) whether the language has a precise meaning which is "readily understood" or whether it is "indefinite and ambiguous;" (2) whether the statement is capable of being objectively characterized as true or false; (3) an examination of the full context of the communication; and (4) "consideration of the broader social context or setting surrounding the communication[.]"

*Wellsville*, 2020 WL 7180987, at *3 (brackets in original) (quoting *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 402 n.7 (2d Cir. 2006)).

Here, Hersperger's alleged statement about Leslie on February 23, 2021, standing alone, could be understood as an accusation that Leslie is a liar. But consideration of the full context and setting reveals that the statement might arguably have been intended to imply something other than propensity to tell falsehoods. Hersperger allegedly made the statement as Leslie was leading new officers on a tour of the Wyoming facility. Thus the statement could be actionable as an accusation that Leslie is misinformed about operations at Wyoming and is unfit for her vocation. *See* Dan B. Dobbs et al., *The Law of Torts* § 525 n.7 (2d ed.) ("Most 'liar' accusations may imply crime or unfitness for a vocation and hence may be actionable on one of those grounds, depending on the facts."). The court will not dismiss this portion of the defamation count.

### 2.    COVID-19 Protocols and Photographing Sergeants

This portion of the defamation claim against Hersperger fails for the same reason that it fails against Balcer. *See supra*.

## VI.    NYSHRL Claims

Based on the same facts underlying the Title VII and § 1983 claims, the proposed Amended Complaint adds three counts under the NYSHRL. (*See* Doc. 36-5 ¶¶ 249–281.) Defendants assert that the proposed NYSHRL claims should be dismissed as futile for a variety

of reasons.  The court begins with the immunity-based arguments raised by DOCCS, Sticht, Balcer, and Yehl.

The NYSHRL forbids discriminatory practices by an "employer," N.Y. Exec. L. § 296(1)(a); *see also id.* § 296(e) (similar "employer" requirement for retaliation claims). DOCCS does not dispute that it is Plaintiffs' "employer" but instead asserts that it is entitled to sovereign immunity under the Eleventh Amendment.  (Doc. 39 at 12.)  Plaintiffs do not dispute that point; indeed, the proposed NYSHRL claims are not brought against DOCCS.

Sticht, Balcer, and Yehl assert that they cannot be subject to "employer" liability under § 296(1)(a) because they have no ownership interest in DOCCS.  (Doc. 39 at 11.)  Plaintiffs do not argue that those individual defendants have any ownership interest in DOCCS.  Instead, Plaintiffs suggest that that Sticht, Balcer, and Yehl were "employers" based on their authority as supervisors "to do more than simply carry out personnel decisions."  (Doc. 42 at 9.)  The court rejects that argument because the New York Court of Appeals has recently stated that the NYSHRL "does not render employees liable as individual employers."  *Bonaffini v. City Univ. of N.Y.*, No. 20-cv-5118 (BMC), 2021 WL 2895688, at *2 (E.D.N.Y. July 9, 2021) (quoting *Doe v. Bloomberg, L.P.*, 36 N.Y.3d 450, 457, 143 N.Y.S.3d 286, 291 (2021)).  Clarifying its prior decision in *Patrowich v. Chemical Bank*, 63 N.Y.2d 541, 483 N.Y.S.2d 659 (1984), the *Doe v. Bloomberg* Court explained that under the NYSHRL "a corporate employee simply does not qualify as an 'employer,' regardless of the employee's position or relationship to the employer." 36 N.Y.3d at 458, 143 N.Y.S.3d at 291.

The analysis does not end there, however, because the NYSHRL provides a second type of individual liability; it "makes individuals liable for aiding, abetting, inciting, compelling or coercing the doing of a discriminatory act."  *Bonaffini*, 2021 WL 2895688, at *2 (cleaned up)

(quoting N.Y. Exec. L. § 296(6)).  Sticht, Balcer, and Yehl argue that they cannot be liable under § 296(6) because, in their view, such liability requires the predicate liability of an "employer," which they say is impossible in this case because of DOCCS's immunity.  (Doc. 39 at 11–12.)  Indeed, courts have held that "the liability of an employer must be established as a predicate to individual liability for aiding and abetting" under § 296(6).  *De Figueroa v. New York*, 403 F. Supp. 3d 133, 163 (E.D.N.Y. 2019).

What if, as here, the employer enjoys Eleventh Amendment immunity?  The court in *De Figueroa* held that the employer's Eleventh Amendment immunity in that case precluded liability for the individual defendants under § 296(6).  *Id.* at 164.  Plaintiffs do not attempt to distinguish *De Figueroa* but instead cite two other cases for the proposition that "[a]n individual state employee may be sued for violating NYHRL even if his employer cannot."  (Doc. 42 at 10.)  Neither of the cases that Plaintiffs cite suggest that Sticht, Balcer, or Yehl could be liable under § 296(6) where the only employer in this case—DOCCS—is immune under the Eleventh Amendment.

The court in *Dodd v. City University of New York*, No. 17 Civ. 9932 (PAE), 2018 WL 4284289 (S.D.N.Y. Sept. 7, 2018), did not decide whether individual defendants could be liable under § 296(6) when the employing institution enjoys Eleventh Amendment immunity.  *Id.* at *9.  The court did not need to reach that issue because a different defendant qualified as an "employer."  *Id.*  That is not the case here.  As discussed above, DOCCS is the only possible "employer" in this case.

The court in *Smith v. State University of New York*, No. 1:00-CV1454(FJS/RFT), 2003 WL 1937208 (N.D.N.Y. Apr. 23, 2003), held that a state university's Eleventh Amendment immunity barred all NYSHRL claims brought by a dyslexic campus public safety officer except

41

for his claim against the university's chief of public safety in his individual capacity. *Id.* at *7. However, it does not appear that the *Smith* court was presented with or considered the question of whether the employer's immunity eliminated the predicate to individual liability under § 296(6). The court dismissed the NYSHRL claim against the public safety chief under 28 U.S.C. § 1367, so that particular issue was not litigated.

It remains to consider Plaintiffs' proposed NYSHRL claims against Hersperger. He argues that Plaintiffs do not—and cannot—allege that he was their "employer." (Doc. 40 at 7.) Plaintiffs' response appears to be two-pronged. First, Plaintiffs argue that Hersperger can be liable as an "employer" because of his supervisory position. (Doc. 41 at 7.) As discussed above, *Doe v. Bloomberg* precludes such individual liability on that theory.

Plaintiffs also note that the NYSHRL is not limited to "employers" but also imposes liability upon aiders and abettors under § 296(6). (Doc. 41 at 7.) That is true, but "an individual cannot aid and abet their own discriminatory conduct." *Boonmalert v. City of N.Y.*, 721 F. App'x 29, 34 (2d Cir. 2018) (summary order). Thus Hersperger cannot be liable under § 296(6) for his own conduct in August or September 2017 when he allegedly uttered the inappropriate sexual and gender-based comments about Leslie, or for his own subsequent alleged harassment and retaliation after she complained. More generally, as discussed above, Plaintiffs cannot establish liability against any of the individual defendants under § 296(6) because the only "employer" in this case, DOCCS, is immune. Based on the above conclusions, it is unnecessary to reach Defendants' remaining arguments against the proposed NYSHRL claims.[16]

---

[16] The remaining arguments include a contention that Leslie has not plausibly alleged an NYSHRL retaliation claim against Sticht, Balcer, and Yehl due to lack of personal involvement. (Doc. 39 at 13–15.) The court is not reaching that issue here but notes that "a finding of personal involvement of the individual defendants in the alleged violation is required to impose liability

## VII.    Plaintiffs' Request for Injunctive Relief

The court considers the portion of Plaintiffs' prayer for relief requesting "[i]njunctive relief reassigning all defendants to a different correctional facility and prohibiting their return to assignment at Wyoming or any other DOCCS facility where Leslie Stevenson and David Stevenson are employed." (Doc. 2 at 29.)  Defendants argue that the court lacks jurisdiction to grant that relief.  (Doc. 19-1 at 15; *see also* Doc. 29-1 at 3 (joining co-defendants' arguments).)  Citing *Ex parte Young*, 209 U.S. 123 (1908), Plaintiffs assert that the court has authority to issue prospective injunctive relief against state officials who violate federal law.  (Doc. 32 at 30.)  Defendants maintain that the *Ex parte Young* doctrine only applies with respect to state officials sued in their official capacities.  (Doc. 34 at 3.)  Perhaps in response to this argument, Plaintiffs' proposed Amended Complaint would expand the claims against the individual defendants to name them in their "representative" (i.e., official) capacities.  (*Compare* Doc. 2 ¶ 24 *with* Doc. 36-5 ¶ 25.)

Defendants advance a variety of arguments against allowing Plaintiffs to add claims against the individual defendants in their official capacities.  (*See* Doc. 39 at 6–7.)  The court agrees with Defendants that the Eleventh Amendment bars money damages against individual state defendants sued in their official capacities.  *Libertarian Party of Erie Cnty. v. Cuomo*, 970 F.3d 106, 123 (2d Cir. 2020).  But the Eleventh Amendment does not bar federal claims seeking "prospective injunctive relief" against state defendants sued in their official capacities.  *Id.*  And while that exception "does not apply to claims based on alleged violations of *state law*,"

---

under Section 1983."  *Colon v. N.Y.C. Hous. Auth.*, No. 16-CV-4540 (VSB), 2021 WL 2159758, at *18 (S.D.N.Y. May 26, 2021) (cleaned up).  The court does not address here any effect the "personal involvement" requirement might have on Plaintiffs' § 1983 claims because Defendants did not raise this argument in their motion to dismiss and the issue appears in Defendants' opposition to the motion to amend solely in the context of opposing the NYSHRL claims.

*Barsoumian v. Williams*, 29 F. Supp. 3d 303, 312 (W.D.N.Y. 2014) (emphasis added), several of Plaintiffs' *federal* claims remain in the case for the reasons discussed above.

Defendants also argue that the relief that Plaintiffs seek is "mandamus" relief that the court lacks jurisdiction to grant against state officials.  (*See* Doc. 39 at 7; Doc. 19-1 at 15–16.) Courts have construed requests to compel a New York State agency to take particular action as requests for mandamus relief.  *E.g.*, *Nappi v. N.Y. State Office of Mental Health*, No. 20-CV-5863 (LLS), 2020 WL 7321398, at *2 (S.D.N.Y. Dec. 10, 2020).  And "[t]he federal courts have no general power to compel action by state officials."  *Strauss v. Ky. Bd. of Med. Licensure*, No. 19-CV-6537L, 2020 WL 1493963, at *3 (W.D.N.Y. Mar. 26, 2020) (quoting *Davis v. Lansing*, 851 F.2d 72, 74 (2d Cir. 1988)).[17]

The court is not persuaded that the relief sought in this case should be characterized as "mandamus" relief.  Mandamus relief is reserved for cases where an officer has "faile[d] to perform a clear, nondiscretionary duty."  *Iqbal v. Sec'y U.S. Dep't of Homeland Sec.*, 190 F. Supp. 3d 322, 327 (W.D.N.Y. 2016) (quoting *Escaler v. U.S. Citizenship & Immigr. Servs.*, 582 F.3d 288, 291 (2d Cir. 2009)).  Transfer or reassignment of DOCCS officers is a *discretionary* personnel decision, not a ministerial duty.  *Cf. Caballero v. Fuerzas Armadas Revolucionarias de Columbia*, No. 20-MC-40-LJV, 2021 WL 1884110, at *7 (W.D.N.Y. May 11, 2021) (reassignment of military defense counsel in *United States v. Ghailani*,

---

[17] Some courts have held that actions seeking mandamus against a state agency do not come within the *Ex parte Young* exception. *See, e.g.*; *Feller v. Didone*, No. DKC-12-1002, 2012 WL 1150806, at *1–2 (D. Md. Apr. 5, 2012) ("[T]he Complaint is not the challenge contemplated by *Ex Parte Young* and is more accurately an action seeking mandamus relief against a state agency.  This Court does not have jurisdiction over State employees in an action for writ of mandamus." (footnote omitted)); *Pearlman v. Vigil-Giron*, No. 02-686 JP/LFG, 2002 WL 35649937, at *2 (D.N.M. June 25, 2002) (*Ex parte Young* did not apply to requested mandamus relief).

686 F. Supp. 2d 279 (S.D.N.Y. 2009), was a "discretionary personnel decision" (quoting
*Ghailani*, 686 F. Supp. 2d at 292)).

But there is a separate problem with Plaintiffs' request for injunctive relief. Since
Plaintiffs rely on the *Ex parte Young* exception to sovereign immunity, the court observes that
that exception "only authorizes suits against officials with the authority to provide the requested
relief." *Siani v. State Univ. of N.Y. at Farmingdale*, 7 F. Supp. 3d 304, 317 (E.D.N.Y. 2014).
Here, the pleadings suggest that Balcer and Hersperger lack authority to order a personnel
transfer; if they did, they presumably would not have needed to enter into the alleged conspiracy
to get David transferred. Plaintiffs have also failed to allege any facts suggesting that
Superintendent Sticht has authority to unilaterally transfer himself or his subordinates to a
different facility. *Cf. Soloviev v. Goldstein*, 104 F. Supp. 3d 232, 245 (E.D.N.Y. 2015) (rejecting
application of *Ex parte Young* exception because the plaintiffs failed to allege any of the
defendants had authority to grant reinstatement). Plaintiffs articulate no other plausible basis to
name the individual defendants in their official capacities. The court dismisses Plaintiffs'
request for injunctive relief reassigning all defendants to a different correctional facility.

## Conclusion

Plaintiffs' Motion to Amend (Doc. 36) is GRANTED IN PART and DENIED IN PART.
The motion is denied insofar as it seeks to name the individual defendants in their official
capacities and insofar as it seeks to add NYSHRL claims. The motion is otherwise granted.

DOCCS, Sticht, Balcer, and Yehl's Partial Motion to Dismiss (Doc. 19) and Hersperger's
Motion to Dismiss (Doc. 29) are both GRANTED IN PART and DENIED IN PART. The court
summarizes its rulings as follows:

**Title VII Claims:**  Consistent with the clarifications in the Amended Complaint, these claims are brought solely against DOCCS.  The individual defendants' motions to dismiss these claims are moot.  The claims remain as against DOCCS.

**Section 1983 Claims:**  Consistent with the clarifications in the Amended Complaint, none of these claims are brought against DOCCS.  DOCCS's motion to dismiss these claims against it are moot.  The § 1983 claims against each individual defendant survive as retaliatory hostile environment (retaliation) claims.

**Section 1985 Claim:**  The intracorporate conspiracy doctrine applies and bars David's § 1985 claim against Balcer and Hersperger.

**Defamation Claims:**  All of the defamation claims are dismissed except for Leslie's claim against Hersperger for his alleged statement on February 23, 2021.

**Request for Injunctive Relief:**  The court dismisses Plaintiffs' request for injunctive relief reassigning all defendants to a different correctional facility.

Dated this 19th day of January, 2022.

Geoffrey W. Crawford, Judge
United States District Court

46