UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

———————————————————————————

DAVID STEVENSON and LESLIE STEVENSON,

                        Plaintiffs,

      v.

NEW YORK STATE DEPARTMENT OF               Civil Action No.  21-CV-355
CORRECTIONS AND COMMUNITY SUPERVISION,
THOMAS STICHT, CRAIG BALCER,
MICHAEL HERSPERGER, and CHRISTOPHER YEHL,

                        Defendants.

———————————————————————————

## **AMENDED COMPLAINT**

      Plaintiffs, Leslie and David Stevenson, by and through their attorneys,

The Coppola Firm, hereby file this amended complaint against defendants and respectfully

allege:

      1.      Leslie Stevenson (Leslie) and David Stevenson (David) file this complaint

regarding their experiences of harassment and retaliation in their workplace, all in

violation of Title VII of the Civil Rights Act of 1964, as amended; 42 U.S.C. § 2000e, *et seq*.;

42 U.S.C. § 1983; and 42 U.S.C. § 1985; New York State Human Rights Law and defamation.

      2.      Leslie's claims are based on her experiences of (1) harassment on the basis

of sex and gender in her workplace; (2) retaliation for objecting to the harassing behavior

she experienced; and (3) retaliation for filing a complaint with her employer about the

sex- and gender-based harassment she experienced.

      3.      David's claims are for retaliation based on (1) his reports of harassing

behavior on the basis of sex and gender in his workplace; (2) his participation as a witness

in an investigation of a complaint of harassment on the basis of sex and gender in his

workplace; and (3) his spouse's participation in the protected activity of filing a complaint

of harassment on the basis of sex and gender.

4.     In short, Lt. Michael Hersperger made inappropriate sexual and gender-

based comments about Leslie, and she complained about it.  Leslie's husband, also an

employee at the same facility, helped her bring forth her complaints.  After that, Leslie and

David had targets on their back.  From excessive scrutiny and nitpicking to isolating them

from their co-workers, defendants are putting their employees' livelihoods and *lives* at

risk by undermining them at every turn.  It must stop.

## JURISDICTION and VENUE

5.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331

because David and Leslie have articulated federal claims under Title VII and 42 U.S.C.

§ 1983.

6.     This Court also has subject matter jurisdiction over Leslie Stevenson's New

York State law claim because it is so related to the claims identified in paragraph 5 that

they form part of the same case or controversy under Article III of the United States

Constitution and/or they are so authorized pursuant to 28 U.S.C. § 1367(a).

7.     This Court has personal jurisdiction over the New York State Department of

Corrections and Community Supervision (DOCCS) because DOCCS operates the

Wyoming Correctional Facility (Wyoming), a medium-security men's prison, located at

3203 Dunbar Road, Town of Attica, Wyoming County, New York.

8.      This Court has personal jurisdiction over Thomas Sticht, Craig Balcer, Michael Hersperger, and Christopher Yehl because, upon information and belief, each of these defendants resides in this District.

9.      Pursuant to 28 U.S.C. § 1391, venue is proper in this District because DOCCS conducts substantial, systematic, and continuous activity in this District, is subject to personal jurisdiction in this District, and because all the acts underlying this lawsuit occurred in this District.

## ADMINISTRATIVE EXHAUSTION

10.     David Stevenson filed a complaint with the Equal Employment Opportunity Commission (EEOC) on this matter on January 28, 2021 [Federal Charge No. 525-2021-00500] and received a Notice of Right to Sue from the EEOC on the same date, a copy of which is attached as Exhibit A.

11.     Leslie Stevenson filed a complaint with the New York State Division of Human Rights (DHR) [Case No. 10207785] on April 21, 2020, and her complaint was cross-filed with the EEOC on the same day [Federal Charge No. 16GC002806].

12.     The DHR issued a probable cause finding on October 1, 2020.  On February 1, 2021, the DHR dismissed Leslie's complaint for administrative convenience, to allow for one adjudication of all the issues Leslie and David presented in a single forum, this District Court.  The EEOC issued a Notice of Right to Sue to Leslie the following day, February 2, 2021, a copy of which is attached as Exhibit B.

13.     This action was timely commenced within 90 days of the issuance of the Right to Sue letters received by David and Leslie.

14.     This amended complaint is proposed for filing via application to the Court at a time prior to the commencement of any discovery or even court-required initial mediation.

## PARTIES

15.     David Stevenson is employed by DOCCS and assigned to Wyoming in Attica, New York.

16.     David is a Lieutenant.

17.     David has been employed by DOCCS for 30 years.

18.     Leslie Stevenson is employed by DOCCS as a Corrections Officer (C.O.).  At all relevant times, she was assigned to Wyoming in Attica, New York.

19.      Leslie has worked for DOCCS for 13 years.

20.     Thomas Sticht is employed as Superintendent at Wyoming and is responsible to supervise all individuals employed there.

21.     Christopher Yehl is employed as Deputy Director of Security (DDS) at Wyoming.  Mr. Yehl investigated Leslie Stevenson's initial complaint.

22.     Craig Balcer is employed as a Captain at Wyoming.

23.     Michael Hersperger is employed as a Lieutenant at Wyoming.

24.     All individual defendants were employees of DOCCS in supervisory roles at Wyoming at all relevant times mentioned below.

## BACKGROUND FACTS AND CIRCUMSTANCES

25.     On June 28, 2017, Kevin P. Bruen, Deputy Commissioner and Counsel for

DOCCS, sent a memorandum to "All Superintendents, Bureau Chiefs and Division Heads"

reminding them that Directive 2602, called "Diversity Management Complaints," and

Directive 2605, called "Sexual Harassment in the Workplace," required supervisory staff to

report allegations of harassment and discrimination to the Office of Diversity Management

(ODM).

26.     The memorandum stated that DOCCS was aware that

"executive/management and supervisory staff have failed to report to the ODM,

discrimination or sexual harassment allegations that they became aware of or reported to

them."  The memorandum further stated that complaints of harassment do not need to be

in writing.

27.     On August 1, 2017, Directive 2602 was updated and released.

Directive 2602 required that all complaints of harassment or discrimination due to real or

perceived membership in a protected class be forwarded to the ODM which, in turn, was

required to forward the complaint to the Office of Counsel and the New York Governor's

Office of Employee Relations (GOER).

28.     In or around August or September 2017, Lieutenant Michael Hersperger

referred to Leslie Stevenson as a "hot, sexy, female C.O." when he answered a phone call

Leslie had placed to her co-worker, C.O. Andrew Lamb.  C.O. Lamb was standing near

Hersperger when Hersperger made this sexist and degrading comment about Leslie, and

C.O. Lamb spoke with Leslie immediately afterward.

29.     When they spoke, Leslie told C.O. Lamb that she was offended by Lt. Hersberger's remark about her and found it inappropriate.  Afterwards, Leslie also told her husband, David, who was a supervisor, that Hersperger had made this remark.

30.     Upon learning that his wife, a lower-ranking co-worker, had been referred to in such a demeaning manner, David approached Hersperger and asked him whether he had said anything inappropriate to or about Leslie.  In sum and substance, David let Hersperger know that the comment was inappropriate and unacceptable in the workplace.

31.     After David confronted Hersperger, and up until the date of this amended complaint, Leslie has experienced ongoing harassment and retaliation by Hersperger for complaining about Hersperger's gender-based and sexual harassment.

32.     Hersperger's harassment and retaliation against Leslie included but is not limited to verbally berating Leslie and referring to her with gendered obscenities.

33.     For example, on June 13, 2018, Hersperger screamed at and threatened Leslie for a purported mistake in prisoner count while she was working at Wyoming's hospital.

34.     Hersperger did not scream at male employees for similar mistakes.

35.     On June 26, 2018, Hersperger yelled obscenities about Leslie in front of her co-workers, C.O. Donna Fanning and C.O. Sean Dupois, when Hersperger once again claimed that there was an error in the prisoner count.

36.     Specifically, Hersperger was heard yelling, "that fucking Leslie Stevenson. When is that bitch gonna learn she can't make her own count up?"

37.     Hersperger's yelling obscenities about Leslie, including gender-based obscenities like "bitch," continued for two to three minutes until C.O. Fanning informed Hersperger that Leslie was not working in the hospital and therefore could not have been responsible for the apparent miscount.

38.     On September 28, 2018, Leslie was working as a Resource C.O. which required her to check the scheduling chart, located in the chart office, to learn her assignments.  Leslie's work brought her to an office where Hersperger was present.  When Leslie arrived, Hersperger began noticeably ogling her, pointedly looking at her body, moving his eyes up and down the length of her body, and making it visibly clear that he was looking at her full body from her head to her feet.

39.     In October 2018, David, who had been transferred in the preceding months, returned to and was again stationed at Wyoming.

40.     In October 2018, Witness "A"[1] told Leslie and David that Hersperger said that he was harassing Leslie so that she would "snap" at him, and he then could report her for insubordination.

41.     Witness "A" also disclosed that Hersperger said that he intended to get David involved so both plaintiffs would be "locked out."[2]

42.     In furtherance of this plan to harass Leslie, on January 10, 2019, Hersperger told Lt. John Wahr that Leslie was not permitted to be scheduled in "the front" as this was

[1] Witness "A" is an individual who is known but is fearful of potential retaliatory action against them for participating in a complaint process and has therefore requested anonymity.

[2] The term "locked out" means not able to work or even be on the property without the Superintendent's approval.  When someone is "locked out," they are not paid or eligible to use accrued time off.

Hersperger's area.  The "up front" assignments are some of the more desirable assignments for C.O.s at Wyoming.

43.     Hersperger also made up reasons to remove Leslie from her assigned duties for reasons that were either false or were minor violations for which no other employees were disciplined.

44.     On January 16, 2019, Leslie was scheduled to and was working in the lobby. At approximately 8:30 a.m., Sgt. Wahr approached Leslie and informed her that Hersperger told Sgt. Wahr that Leslie must be taken off the lobby assignment because Leslie was not wearing the appropriate uniform.

45.     Later that day, Sgt. Wahr told David that Hersperger directed him to remove Leslie from her assignment.

46.     No other employees assigned to the lobby were held to the same uniform standard to which Hersperger held Leslie on January 16, 2019.

47.     In fact, the co-worker who relieved Leslie from her post was similarly in violation of uniform standards and nonetheless was permitted by Hersperger to continue working for the remainder of the shift.

48.     In addition, the employee who worked the lobby assignment the day prior also was similarly in violation of uniform standards and nevertheless was permitted to continue working.

49.     Hersperger was targeting Leslie due to her objection to his sexualized comments about her.

50.     Hersperger continued to change Leslie's jobs and assignments to prevent her from having the more desirable jobs.

51.     On February 25, 2019, Leslie sought help by calling C.O. Chris Hickey, Leslie's union representative, to complain about Hersperger's harassment due to her sex and gender and his increasingly hostile treatment towards her after she made it clear that his sexual comments to her were unwelcome.

52.     C.O. Hickey responded that he needed to talk to Supt. Sticht about the process for making a complaint.

53.     On February 27, 2019, Leslie again contacted C.O. Hickey to inquire whether he had talked to Supt. Sticht about the process for making a complaint, but she did not get a response.

54.     Despite her notifying her union representative of these issues and requesting help, on February 28, 2019 Leslie's schedule was changed once again, prohibiting her from working in the more-desirable lobby assignment on March 1, 2019 as she previously had been assigned.

55.     Sgt. Donald Donnelly made this change to the schedule on behalf of Hersperger who told Sgt. Donnelly that he did not want Leslie working up front.

56.     On March 1, 2019, during a meeting among Supt. Sticht, C.O. Hickey and Leslie, Leslie made a verbal complaint to Supt. Sticht about Hersperger's harassing and retaliatory behavior toward her due to her sex and gender.

57.     Contrary to the clear directive of the June 2017 memorandum described in paragraph 26 above, during this meeting, Supt. Sticht told Leslie that she needed to make a written complaint in order for it to be addressed because what she shared verbally was "all hearsay."

58.     Despite the fact that a written complaint was not required, Leslie dutifully complied and submitted a written complaint to Supt. Sticht in a document dated March 2, 2019.

59.     Consistent with DOCCS's practices of flouting rules and written policies and procedures related to allegations of harassment, Supt. Sticht decided to investigate the complaint in-house rather than sending the complaint to ODM in accordance with Directive 2602.

60.     Supt. Sticht assigned Christopher Yehl, Deputy Director of Security, at Wyoming, to investigate.

61.     This investigation subjected Leslie to increased harassment and to retaliatory behaviors that continue to this day.

62.     Shortly after Leslie made her formal complaint, on March 8, 2019, Hersperger refused to share information regarding a transportation issue with Leslie. Instead, he called the compound gate post, where Leslie was stationed, and hung up the phone once he realized that Leslie was assigned there.

63.     On March 15, 2019, as part of the in-house investigatory process, David wrote a letter to DDS Yehl informing him that David was a witness to an incident Leslie had reported in her complaint of harassment.

64.     David's engaging in this protected activity sparked a series of retaliatory actions by Supt. Sticht, Hersperger, Capt. Balcer and DDS Yehl that continue to this day.

65.     During a scheduling meeting on March 17, 2019, Sgt. Wahr recommended to Hersperger that Leslie be selected to fill a vacant movement and control role.  This was an "up front" assignment.

66.     In response to Sgt. Wahl's recommendation that Leslie be assigned an "up front" role for which she was qualified, Hersperger stated words to the effect of "she will never work up here."

67.     On this same day, March 17, 2019, Hersperger visited the Special Housing Unit (SHU) as part of his regular rounds.  While there, C.O. Keith Kurek told Hersperger that Leslie had filed a formal complaint about Hersperger's harassing behavior towards Leslie.

68.     In response to learning that Leslie had made a complaint about him, Hersperger became physically and verbally aggressive by slamming doors and yelling.

69.     On March 19, 2019, Leslie learned that in connection with the investigation, DDS Yehl instructed potential witnesses that anyone who did not want to be involved should just write "whatever" and state that they did not want to be involved.

70.     Leslie complained about this instruction to Supt. Sticht and told him that she wanted her complaint referred to ODM instead.

71.     Supt. Sticht admitted to Leslie that the longstanding conduct to which David and Leslie are continuing to be subjected is in retaliation for their participation in the complaint process.

72.     In response to Leslie's expressing her concerns about DDS Yehl's investigation, Supt. Sticht said to Leslie "what did you expect when filing a complaint like this.  You should have known there would be ramifications."

73.     On March 21, 2019, Hersperger harassed and retaliated against David by assigning David overtime without telling David, so that David would miss his overtime shift and be subject to discipline.

11

74.    When David learned that Hersperger scheduled David for overtime without telling him, David immediately wrote to Capt. Higgins, DDS Yehl and Supt. Sticht, informing them about Hersperger's conduct.  David specifically stated that Hersperger did this in retaliation for (a) Leslie's making a complaint about Hersperger and (b) David's participation in that process.

75.    Hersperger's retaliation against and harassment of David and Leslie continued.  He tried to set up David and Leslie so they would be disciplined or fired; made false and disparaging comments about Leslie and David to their co-workers; created a hostile work environment for them; and refused to communicate with David about his schedule, making it impossible for David to do his job.

76.    For example, on May 1, 2019, Capt. Balcer falsely accused David of leaving State grounds with a State vehicle on April 13, 2019 and failing to sign logbooks.

77.    When Capt. Balcer made these false allegations, he began this conversation by asking "Why are you dragging me and Captain Higgins into your bullshit?" referring to Leslie's complaints.

78.    On May 2, 2019, David wrote to ODM complaining of harassment and retaliation because of his participation in the investigation of Leslie's complaint.

79.    On  May 8, 2019, David wrote to Capts. Higgins and Balcer, with a copy to DDS Yehl and Supt. Sticht, regarding his inability to do his job because Hersperger refused to respond to David about scheduling.  He also alleged harassment and retaliation because of his participation in Leslie's complaint.

80.    In June 2019, Hersperger continued his campaign to get Leslie and David fired and disparaged them by encouraging other employees to advocate for the passage of

a draft directive (number 2117) which would prohibit co-workers from having relationships, and by telling co-workers that David and Leslie working at the same facility was a security risk.

81.    On or around June 15, 2019, Hersperger told a C.O. that he was committing a uniform violation.  He commented that in the past they did not care about the uniform standards directive, "but because of Leslie Stevenson, this all changed."

82.    On August 5, 2019, Hersperger became irate, threw objects, and disparaged Leslie during her shift.

83.    The following day, August 6, 2019, Hersperger refused to speak to Leslie at all.

84.    Leslie's assignment that day required communication with Hersperger, so Hersperger's refusal to speak with Leslie made it almost impossible to safely fulfill her job responsibilities.

85.    Throughout the month of September 2019, Hersperger set up Leslie to make it appear that she was not following protocol and complained to other employees about Leslie and her qualifications to perform her job.

86.    Leslie was routinely denied "up front" roles, because Hersperger told supervisors that Leslie should not get those roles because Hersperger did not want to be "walking on eggshells" all day.

87.    Hersperger further said that he was not going to let the sergeants "train stupid fucking people," referring to Leslie.

88.     On January 27, 2020, the memorandum regarding the supervision of relatives was placed on the bulletin board of the watch commander's post where David worked, with the phrase "do what is right not what is easy" taped to it.

89.     Portions of this document referencing the prohibition of providing special treatment to relatives were highlighted.

90.     Because David is the only lieutenant with a C.O. as a family member at Wyoming, David, Leslie, and the other employees all knew that this posted document was directed at David and Leslie.

91.     In February 2020, Hersperger questioned Leslie's colleagues about whether her hair was within regulation length (which it was).

92.     On or around February 20, 2020, Hersperger screamed and yelled in the chart office regarding how he planned to do "everything in his power" to get David fired or transferred.

93.     David later learned from a co-worker that on February 21, 2020 Hersperger and Capt. Balcer discussed steps they would take to get David transferred or fired.

94.     The day following Hersperger's outburst in the chart office, Capt. Balcer told David that he must re-write a memorandum about an issue that David believed had already been resolved involving his leaving early on a scheduled "turn around" assignment.

95.     It was only after Leslie filed her complaint with ODM that Capt. Balcer initiated disciplinary action against David for engaging in this practice.

96.     Capt. Balcer did not discipline any other individual who engaged in this common practice.

14

97.     Upon learning of this pending disciplinary action, David went to his Union representative who worked out an arrangement by which David could put in a request for time off to cover the hours he was not on shift and write a memorandum stating that he would not do it again.

98.     No other employees who engaged in this common practice have been required to write such memoranda or threatened with discipline.

99.     On February 22, 2020, having learned that Capt. Balcer and Hersperger had discussed a plan to get David fired or transferred, David wrote a memorandum to Capt. Timothy Heath, who was Acting Deputy Superintendent of Security at the time, regarding the ongoing harassment he was experiencing.

100.     The same day, Leslie encountered Hersperger in the chart office.  On seeing Leslie, Hersperger became physically threatening and hostile, slamming doors, kicking a garbage can and throwing things into boxes.

101.     David continued to be harassed by Capt. Balcer.  On March 2, 2020, Capt. Balcer conducted a formal counseling meeting with David in a hallway related to his leaving early on the scheduled turn around referenced in paragraphs 94 through 98, above.

102.     This formal counseling was conducted in front of David's co-workers and subordinates after David had been relieved for the day, causing David significant embarrassment and humiliation.

103.     Conducting counseling in this manner is contrary to DOCCS's policies and procedures.

104.    On March 16, 2020, Capt. Balcer sent a memorandum to David finding him responsible for violating several policies in connection with the scheduled turnaround time issue.

105.    In response, David filed a grievance to Council 82 (the Union representing lieutenants) noting that he already had been both formally and informally counseled on this issue and that he wanted the formal memorandum that Capt. Balcer wrote on March 16, 2020 to be removed from his personnel file.

106.    On March 23, 2020, Capt. Balcer belittled David during a conversation he had with Sergeant Jeffery Walker.

107.    Sgt. Walker reported this highly unusual activity to David as David is of a higher rank than, and supervised, Sgt. Walker.

108.    On or around April 11 or 12, 2020, Hersperger moved Leslie to another, less desirable, post for an upcoming shift without notification.

109.    On April 15, 2020, LaSonya Spearman, Affirmative Action Officer employed by GOER, notified Leslie that the GOER investigation into her allegations of harassment and retaliation was completed, her complaint of retaliation had been substantiated, and administrative action was being recommended.

110.    On April 16, 2020, Leslie filed a grievance about Hersperger's unauthorized change of Leslie's schedule to move her to a less-desirable post.

111.    Noting that no substantive efforts were being made to resolve the ongoing harassment she was experiencing, Leslie filed a complaint with the New York State Division of Human Rights, which was accepted on April 21, 2020 and assigned EEOC charge # 16GC002806.

112.     On April 23, 2020, Capt. Balcer began an investigation into Leslie's grievance against Hersperger for the April 17, 2020 shift rescheduling issue.

113.     Sgt. Wahr and Sgt. Jason Currier submitted statements in connection with this investigation that supported Leslie's view that she had been inappropriately moved to a less desirable job.

114.     Sgt. Wahr reported in a document dated April 24, 2020 with the subject "C.O. L. Stevenson's Grievance" that it was "absolutely unprofessional that someone placed C.O. L. Stevenson in a position to be unsure as to what time she should report to work, it's clear harassment and should not have been tolerated. . . ."

115.     Upon information and belief, on May 7, 2020, Hersperger told C.O. Cleveland that he should make Leslie's grievance(s)/complaint "go away."

116.     Upon information and belief, Hersperger required Sgts. Gumulak and Peter Reynolds to write a memorandum complaining about David.

117.     Leslie went out on medical leave from May 20, 2020 to November 16, 2020 due to a work injury.

118.     While Leslie was on leave, defendants focused on demeaning and harassing David.

119.     On September 29, 2020, for example, David became aware that the Office of Special Investigations was looking into an anonymous allegation lodged by someone who worked at Wyoming that falsely accused David of acting in contradiction of COVID-19 protocols.

120.     Upon information and belief, Capt. Balcer or Hersperger made this complaint.

121.    On October 14, 2020, Capt. Balcer tried to remove David from an overtime job and replace him with Lt. William Gregoire in violation of the collective bargaining agreement's overtime provisions.

122.    The following day, Lt. Vicky Skipper told David that he needed to "watch his back" because Capt. Balcer was targeting him.

123.    Leslie returned to work on light duty on November 16, 2020 and continued light duty until December 25, 2020.

124.    In the beginning of December, Leslie was assigned to the arsenal and worked 6:15 a.m. to 2:30 p.m., which are the regular hours that all arsenal employees worked.

125.    After Leslie completed this shift, Hersperger pulled Leslie's timecard from its slot.

126.    Hersperger then brought Leslie's card to Capt. Balcer and alleged that Leslie was violating policy by leaving early because Hersperger believed that someone on light duty must work from 7:00 a.m. to 3:00 p.m.

127.    As a result of this complaint by Hersperger, David was interviewed by Dep. Supt. Heath and accused of giving Leslie permission to leave early.

128.    In addition, Hersperger's report of Leslie working 6:15 a.m. to 2:30 p.m. prompted an inquiry into whether these hours were appropriate.  This inquiry led to Leslie's colleagues resenting her presence at the arsenal because Leslie's assignment had resulted in facility leadership questioning whether arsenal employees should be permitted to work these nonstandard (though preferred) hours.

129.   On December 14, 2020, Hersperger relieved David from his post early, assuring him that his timecard would be adjusted to reflect Hersperger's early relief.  It was not.

130.   This failure to correct the timecard made David ineligible for overtime and allowed Hersperger to receive the overtime.

131.   By around December 2020, David's co-workers, with whom he always had good experiences in the past, now were regarding him with suspicion and avoiding him.

132.   C.O.s Steven Hartwig and Keith Kurek told David that they had been told by a "supervisor" that David was in the parking lot with a camera trying to catch sergeants leaving early for the purpose of having them written up.

133.   Upon information and belief, the supervisor who spoke to C.O.s Hartwig and Kurek was either Hersperger or Capt. Balcer.

134.   While this accusation was completely false, it nevertheless characterized David as a rat and untrustworthy – which is extremely dangerous in a correctional facility.

135.   On January 13-14, 2021, David reported to work for his shift as Watch Commander from 11:00 p.m. to 7:00 a.m.

136.   Upon information and belief, Hersperger or Capt. Balcer posted a new copy of the memorandum regarding supervision of family members (which had previously been taken down), and an additional highlighted copy of the same memorandum also was placed in the watch command logbook.

137.   Capt. Balcer canceled Leslie's scheduled range time in January 2021, which is necessary for her to retain her Peace Officer status.

138.    On the same day, Hersperger intentionally failed to include David on an email that had scheduling details essential for David to do his job as Watch Commander.

139.    On February 23, 2021, Leslie was giving a tour of Wyoming to new C.O.s, and Hersperger yelled "don't believe a fucking word she says" as she walked through the administration building.

## FIRST CAUSE OF ACTION

### DISCRIMINATION ON THE BASIS OF SEX/GENDER AND SEXUAL HARASSMENT BY DOCCS AGAINST LESLIE STEVENSON IN VIOLATION OF TITLE VII

140.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

141.    Leslie is a woman and is known to be a woman by all defendants.

142.    Leslie is qualified to fulfill the duties of a Corrections Officer.

143.    Leslie was treated differently from her similarly situated male counterparts by her supervisors they called a "hot, sexy, female C.O.," "bitch," and other gendered terms, as described above.

144.    Leslie was treated differently from her similarly situated male counterparts by her supervisors when she received inferior work assignments, as described above.

145.    Leslie was treated differently from her similarly situated male counterparts by her supervisors when she was falsely accused of violated policies, as described above.

146.    Leslie was treated differently from her similarly situated male counterparts by her supervisors when she was held to different standards than her similarly situated male counterparts, as described above.

147.    At all relevant times, Leslie has been referred to by degrading, gendered terms, including gendered swear words; has had her physical appearance excessively and publicly scrutinized, at times in an overtly sexual manner; has had her schedule repeatedly changed to place her in less desirable work areas; and has been denied the assignments for which she was qualified and available, all due to her sex and gender.

148.    Leslie's workplace has become a hostile environment because of this harassment on the basis of her sex and gender.

149.    Defendants were and, specifically, DOCS was, aware of the harassment Leslie faced and did not take reasonable care to prevent or promptly correct it, despite multiple pleas from the plaintiffs that they do so.

150.    The harassment Leslie suffered was sufficiently severe and pervasive to alter the terms and conditions of her employment and created an abusive working environment.

151.    By reason of the defendants' actions, conduct, and omissions, Leslie is entitled to damages under 42 U.S.C. § 1981a.

152.    As a result of defendants' actions, conduct, and omissions, including but not limited to those described above, Leslie incurred damages including but not limited to damage to her reputation in her profession and the community; severe emotional distress and mental anguish; degradation; embarrassment; and punitive or exemplary damages. Leslie Stevenson, therefore, is entitled to damages against DOCCS in an amount in excess of $1 million.

153.    Pursuant to 42 U.S.C. § 2000 e-5(k), Leslie Stevenson also is entitled to reasonable costs and attorneys' fees.

## SECOND CAUSE OF ACTION

## RETALIATION BY DOCCS AGAINST LESLIE STEVENSON IN VIOLATION OF TITLE VII

154.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

155.    Leslie objected to Hersperger's sex-based language toward her in 2017.

156.    Leslie's objection to sexual harassment and attempts to stop sexual harassment from continuing to be perpetrated against her in the workplace are protected activities.

157.    Leslie made formal complaints internally, to GOER, and to the New York State Division of Human Rights regarding the conduct she experienced from defendants, all of whom worked for DOCCS at the time.

158.    Making these complaints constitutes a protected activity within its meaning under Title VII.

159.    All defendants were, and specifically DOCCS was, aware that Leslie engaged in these protected activities.

160.    After Leslie engaged in the protected activity of objecting to sex- and gender-based harassment she was harassed, ogled, subjected to verbal and physical aggression, unfairly removed from more desirable job assignments, required to meet uniform standards to which no other employee was required to meet.

161.    After Leslie engaged in the protected activity of objecting to sex- and gender-based harassment, defendants changed Leslie's schedule to place her in less-desirable roles, withheld from her information necessary for her to do her job which put her safety in jeopardy, subjected her to a retaliatory sham investigation, limited and/or

22

prohibited her work and training opportunities, yelled obscenities at and about her, and threw and kicked items at and/or around her.

162.     After Leslie engaged in the protected activity of objecting to sex- and gender-based harassment defendants subjected Leslie to a campaign to isolate her from colleagues and insinuated to coworkers that she was a security risk to the facility.

163.     The aforementioned actions are adverse employment actions in retaliation for her complaining of sex and gender-based harassment.

164.     The aforementioned actions are adverse employment actions creating a retaliatory hostile work environment for Leslie.

165.     All individual defendants who perpetrated such unlawful conduct against Leslie were, at relevant times, supervisory staff employed by DOCCs.

166.     As Leslie made multiple complaints of this retaliatory behavior to supervisory staff at Wyoming, GOER and the NYS Division of Human Rights (which complaint was cross filed with the EEOC), DOCCS was aware that Leslie was being retaliated against because she made complaints of harassment on the basis of her sex and gender.

167.     DOCCS permitted this retaliatory hostile work environment to exist.

168.     DOCCS encouraged this retaliatory hostile work environment to exist.

169.     DOCCS knew of and yet ignored this retaliatory hostile work environment.

170.     Defendants' actions, conduct, and omissions proximately caused Leslie to incur damages including, but not limited to, damage to her reputation in her profession and the community; severe emotional distress and mental anguish; degradation;

embarrassment; and punitive or exemplary damages. Leslie Stevenson, therefore, is entitled to damages from DOCCS in an amount in excess of $1 million.

171.    Pursuant to 42 U.S.C. § 2000 e-5(k), Leslie Stevenson also is entitled to reasonable costs and attorneys' fees.

**THIRD CAUSE OF ACTION**

**RETALIATION BY DOCCS AGAINST DAVID STEVENSON IN VIOLATION OF TITLE VII**

172.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

173.    David made reports to his Union, served as a witness and supported his wife Leslie in her complaints of sexual harassment and retaliation to superiors, GOER and the New York State Division of Human Rights.

174.    Making these complaints on his own and on his wife's behalf, and acting as a witness for Leslie in her complaints, constitutes a protected activity within its meaning under Title VII.

175.    By opposing discrimination on behalf of his wife, Leslie, David is a member of a protected class.

176.    All defendants were aware that David engaged in these protected activities.

177.    After Leslie suffered discrimination and harassment and engaged in the protected activity of complaining of sex- and gender-based harassment and discrimination, and David cooperated in the process, Hersperger intentionally, willfully, and openly retaliated against David.

178.    As described more fully above, Hersperger retaliated against David by assigning him to overtime without notifying him, making false accusations against him for

24

minor policy infractions, refusing to provide him with information necessary to do his job and by disparaging him to colleagues by insinuating that he was a security risk and failed to follow regulations.

179.    After David engaged in protected activity, Capt. Balcer intentionally, willfully, and openly retaliated against David by making false accusations regarding minor disciplinary infractions, holding David accountable to higher standards than his peers, preventing David from obtaining overtime hours, conducting formal counseling in a public space for the purpose of humiliating David in front of his peers and belittling David to his subordinates.

180.    Capt. Balcer's behavior was so clearly wrongful that David's colleagues warned David that Capt. Balcer was targeting him.

181.    The aforementioned actions are adverse employment actions in retaliation for David having engaged in a protected activity of opposing harassment and discrimination and participating as a witness in an investigation.

182.    The aforementioned actions are adverse employment actions creating a retaliatory hostile work environment for David.

183.    Capt. Balcer and Hersperger were, at all relevant times mentioned in this complaint, supervisory staff employed by DOCCs, a prison system of the State of New York.

184.    DOCCS permitted this retaliatory hostile work environment to exist.

185.    DOCCS encouraged this retaliatory hostile work environment to exist.

186.    DOCCS knew of and yet ignored this retaliatory hostile work environment.

187.    DOCCS knew that the aforementioned retaliatory behavior occurred, because David complained of it in reports to supervisory staff at Wyoming, to his Union and to the EEOC (which complaint was cross-filed with the NYS Division of Human Rights).

188.    DOCCS did not take any steps to stop the behavior, nor to prevent it from reoccurring.

189.    DOCCS's actions, conduct, and omissions proximately caused David to incur damages including, but not limited to, damage to his reputation in his profession and the community; severe emotional distress and mental anguish; degradation; embarrassment; and punitive or exemplary damages.  David Stevenson, therefore, is entitled to damages from DOCCS in an amount in excess of $1 million.

190.    Pursuant to 42 U.S.C. § 2000 e-5(k), David Stevenson also is entitled to reasonable costs and attorneys' fees.

## FOURTH CAUSE OF ACTION

### DISCRIMINATION BY HERSPERGER AGAINST LESLIE STEVENSON IN VIOLATION OF 42 U.S.C. § 1983.

191.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraph as though fully set forth herein.

192.    Leslie Stevenson asserts this cause of action against Hersperger in his individual capacity because he deprived her of equal protection in her employment.

193.    At all relevant times, Hersperger was acting under color of State law.

194.    At all relevant times, Hersperger was in uniform and acting in a supervisory capacity for DOCCS, a prison system of the State of New York.

195.    At all relevant times, Hersperger engaged in acts of discrimination against Leslie as described in detail in this amended complaint.

196.    Hersperger's conduct deprived Leslie of her Constitutional rights to equal protection in her employment.

197.    Hersperger's conduct, as set forth above, was on the basis of Leslie's sex and/or gender and was therefore unlawful.

198.    Hersperger's actions, conduct, and omissions proximately caused Leslie to incur damages including, but not limited to, damage to his reputation in his profession and the community; severe emotional distress and mental anguish; degradation; embarrassment; and punitive or exemplary damages.  She therefore is entitled to damages from Hersperger in an amount in excess of $1 million.

**FIFTH CAUSE OF ACTION**

**SEXUAL HARASSMENT BY HERSPERGER AGAINST LESLIE STEVENSON
IN VIOLATION OF 42 U.S.C. § 1983.**

199.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraph as though fully set forth herein.

200.    Leslie Stevenson asserts this cause of action against Hersperger in his individual capacity because he deprived her of equal protection in her employment.

201.    At all relevant times, Hersperger was acting under color of State law.

202.    At all relevant times, Hersperger was in uniform and acting in a supervisory capacity for DOCCS, a prison system of the State of New York.

203.    At all relevant times, Hersperger engaged in acts of unlawful harassment against Leslie as described in detail in this amended complaint.

204.    Hersperger's unlawful sexual harassment deprived Leslie of her Constitutional rights to equal protection in her employment.

205.    Hersperger's unlawful sexual harassment, as set forth above, was on the basis of Leslie's sex and/or gender and was therefore unlawful.

206.    Hersperger's unlawful sexual harassment proximately caused Leslie to incur damages including, but not limited to, damage to his reputation in his profession and the community; severe emotional distress and mental anguish; degradation; embarrassment; and punitive or exemplary damages.  She therefore is entitled to damages from Hersperger in an amount in excess of $1 million.

### SIXTH CAUSE OF ACTION

### RETALIATION BY HERSPERGER, BALCER, STICHT, AND YEHL AGAINST LESLIE STEVENSON IN VIOLATION OF 42 U.S.C. § 1983

207.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

208.    Leslie brings this cause of action against Hersperger, Balcer, Sticht and Yehl in their individual capacities for their deprivation of her rights for equal protection in employment.

209.    Leslie engaged in protected activities when she reported sexual harassment and discrimination by defendants, as detailed herein.

210.    After Leslie engaged in the protected activity of reporting and objecting to sex- and gender-based harassment she was further harassed, ogled, subjected to verbal and physical aggression, unfairly removed from more desirable job assignments, and required to meet uniform standards to which no other employee was required to meet.

211.    After Leslie engaged in the protected activity of objecting to sex- and gender-based harassment defendants changed Leslie's schedule to place her in less-desirable roles, withheld information necessary for her to do her job from her, putting her

safety in jeopardy, subjected her to a retaliatory sham investigation, limited and/or prohibited her work and training opportunities, yelled obscenities at and about her, and threw and/or kicked items at or around her.

212.    After Leslie engaged in the protected activity of objecting to sex- and gender-based harassment defendants subjected Leslie to a campaign to isolate her from colleagues and insinuated that she was a security risk to the facility.

213.    The aforementioned actions are adverse employment actions in retaliation for her complaining of sex and gender-based harassment.

214.    The aforementioned actions are adverse employment actions creating a retaliatory hostile work environment for Leslie.

215.    Hersperger took adverse employment actions against Leslie because of her sex and gender and in retaliation for her engaging in the protected activity of making complaints of sex based discrimination and harassment.

216.    Balcer, Sticht and Yehl retaliated against Leslie because she engaged in the protected activity of making complaints about sex based harassment and discrimination by taking adverse employment actions against Leslie and/or creating a retaliatory hostile work environment.  By their actions and/or omissions as set forth herein, Balcer, Schicht, and Yehl, individually and in concert with one another, retaliated against Leslie in violation of the law.

217.    Hersperger, Balcer, Sticht and Yehl engaged in the above referenced adverse actions against Leslie while in uniform and carrying out their jobs for DOCCS and therefore engaged in state action and action under color of state law.

218.    The conduct of Hersperger, Balcer, Sticht and Yehl proximately caused damages to Leslie including, but not limited to, damage to her reputation in her profession and the community; severe emotional distress and mental anguish; degradation; embarrassment; and punitive or exemplary damages.  She therefore is entitled to damages from Hersperger, Balcer, Sticht, and Yehl, jointly and severally, in an amount in excess of $1 million.

### SEVENTH CAUSE OF ACTION

**RETALIATION BY HERSPERGER AND BALCER
AGAINST DAVID STEVENSON IN VIOLATION OF 42 U.S.C. § 1983**

219.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

220.    David brings this cause of action against Hersperger and Balcer in their individual capacities for their deprivation of his rights for equal protection in employment.

221.    David made reports to his Union, served as a witness and supported his wife Leslie in her complaints of sexual harassment and retaliation to superiors, GOER and the New York State Division of Human Rights.

222.    Making these complaints on his own and on his wife's behalf and acting as a witness for Leslie in her complaints, constitute protected activities within its meaning under New York Human Rights Law.

223.    By opposing discrimination on behalf of his wife, Leslie, David is a member of a protected class.

224.    All defendants were aware that David engaged in these protected activities.

225.    After Leslie suffered discrimination and harassment and engaged in the protected activity of complaining of sex- and gender-based harassment and discrimination, and David cooperated in the process, Hersperger intentionally, willfully, and openly retaliated against David.

226.    As described more fully above, Hersperger retaliated against David by assigning him to overtime without notifying him, making false accusations against him for minor policy infractions, refusing to provide him with information necessary to do his job and by disparaging him to colleagues by insinuating that he was a security risk and failed to follow regulations.

227.    After David engaged in protected activity, Capt. Balcer intentionally, willfully, and openly retaliated against David by making false accusations regarding minor disciplinary infractions, holding David accountable to higher standards than his peers, preventing David from obtaining overtime hours, conducting formal counseling in a public space for the purpose of humiliating David in front of his peers and belittling David to his subordinates.

228.    Capt. Balcer's behavior was so clearly wrongful that David's colleagues warned David that Capt. Balcer was targeting him.

229.    The aforementioned actions are adverse employment actions in retaliation for David having engaged in a protected activity of opposing harassment and discrimination and participating in an investigation.

230.    The aforementioned actions are adverse employment actions creating a retaliatory hostile work environment for David.

231.    Hersperger and Balcer engaged in the above referenced adverse actions against David while in uniform and carrying out their jobs for DOCCS and therefore engaged in state action and action under color of state law.

232.    The conduct of Hersperger and Balcer proximately caused damages to David including, but not limited to, damage to his reputation in his profession and the community; severe emotional distress and mental anguish; degradation; embarrassment; and punitive or exemplary damages.  He therefore is entitled to damages from Hersperger and Balcer, jointly and severally, in an amount in excess of $1 million

## EIGHTH CAUSE OF ACTION

## LESLIE STEVENON'S DEFAMATION CLAIM AGAINST HERSPERGER

233.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

234.    Hersperger made false statements to third parties for the purpose of shaming, disgracing and ostracizing Leslie when he yelled out "don't believe a fucking word she says" to new officers as described above.

235.    An ordinary person would interpret these statements as intended to shame, disgrace, and ostracize plaintiffs.

236.    There is only one reasonable interpretation of the statements made by Hersperger.

237.    Hersperger made such statements with actual malice and the intent to harm Leslie Stevenson in her profession.

238.    The statements made by Hersperger regarding Leslie Stevenson injured Leslie Stevenson in her profession and are therefore statements that constitute defamation per se.

239.    Defendant Hersperger's actions, conduct, and omissions proximately caused Leslie Stevenson to incur damages including but not limited to damage to her reputation in her profession and the community; severe emotional distress and mental anguish; degradation; embarrassment; and punitive or exemplary damages.  Leslie Stevenson, therefore, are entitled to damages against them, jointly and severally, in an amount in excess of $1 million, together with reasonable costs and attorneys' fees.

### **PRAYER FOR RELIEF**

**WHEREFORE**, plaintiffs demand judgment against defendants, jointly and severally, as follows:

(1) Compensatory damages in excess of $6 million, punitive damages in excess of $10 million, and reasonable attorneys' fees and expenses.

(2) Awarding such other and further relief as this Court deems just and proper.

***PLAINTIFFS DEMAND A TRIAL BY JURY.***

Dated:  February 3, 2022
            Buffalo, New York

**THE COPPOLA FIRM**
Attorneys for Plaintiffs

By:  *Jennifer R. Scharf*

Lisa A. Coppola, Esq.
Jennifer R. Scharf, Esq.
3960 Harlem Road
Buffalo, New York  14226
(716) 839-9700
Email:  jscharf@coppola-firm.com

33

# EXHIBIT A

EEOC Form 161-B (11/2020)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

To:  **David Stevenson**
    **948 Friedman Road**
    **Attica, NY 14011**

From:  **Buffalo Local Office**
    **300 Pearl Street**
    **Suite 450**
    **Buffalo, NY 14202**

[ ]   *On behalf of person(s) aggrieved whose identity is*
*CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **525-2021-00500** | **Maureen Kielt,**<br>**Local Office Director** | **(716) 431-5016** |

*(See also the additional information enclosed with this form.)*

**NOTICE TO THE PERSON AGGRIEVED:**

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

[ ]   More than 180 days have passed since the filing of this charge.

[X]   Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

[X]   The EEOC is terminating its processing of this charge.

[ ]   The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, **the paragraph marked below applies to your case:**

[ ]   The EEOC is closing your case. Therefore, your lawsuit under the ADEA **must be filed in federal or state court WITHIN 90 DAYS of your receipt of this Notice.** Otherwise, your right to sue based on the above-numbered charge will be lost.

[ ]   The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

## Maureen C. Kielt

Digitally signed by Maureen C. Kielt
DN: cn=Maureen C. Kielt, o=Equal Employment Opportunity Commission,
ou=Buffalo Local Office, email=maureen.kielt@eeoc.gov, c=US
Date: 2021.01.28 15:56:10 -05'00'

Enclosures(s)

**Maureen Kielt,**
**Local Office Director**

*(Date Issued)*

cc:  **Niclole Keith**
    **Diversity Management**
    **NYS DEPT OF CORRECTIONAL SERVICES**
    **1220 Washington Ave**
    **Building 2**
    **Albany, NY 12226**

    **Jennifer Scharf, Esq.**
    **THE COPPOLA FIRM**
    **3960 Harlem Road**
    **Buffalo, NY 14226**

# EXHIBIT B

EOC Form 161 (11/2020)

U.S. E**QUAL** E**MPLOYMENT** O**PPORTUNITY** C**OMMISSION**

D**ISMISSAL AND** N**OTICE OF** R**IGHTS**

| To: | **Leslie Stevenson**<br>**948 Friedman Rd**<br>**Attica, NY 14011** | From: | **New York District Office**<br>**33 Whitehall Street**<br>**5th Floor**<br>**New York, NY 10004** |
|---|---|---|---|

| | *On behalf of person(s) aggrieved whose identity is*<br>*CONFIDENTIAL (29 CFR §1601.7(a))* |

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **16G-2020-02806** | **Holly M. Shabazz,**<br>**State & Local Program Manager** | **(929) 506-5316** |

**THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:**

[X] The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ] Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

[ ] The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

[ ] Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

[ ] The EEOC issues the following determination: The EEOC will not proceed further with its investigation, and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

[ ] The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[X] Other *(briefly state)*    **Charging Party wishes to pursue matter in Federal District Court.**

**- NOTICE OF SUIT RIGHTS -**
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

On behalf of the Commission

*[signature]*

February 2, 2021

Enclosures(s)

**Judy A. Keenan,**
**District Director**

*(Date Issued)*

cc:    **Attn: Cheyenne Burke, Assistant Counsel**        Lisa A. Coppola, Esq.
**NEW YORK STATE DEPARTMENT OF CORRECTION**
**CounselsOffice@doccs.ny.gov**
**Albany, NY 12226**